NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 180740-U

NO. 4-18-0740

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 27, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| CHUCK DUCKWORTH, | ) | No. 16CF443 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Roger B. Webber, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justice Turner concurred in the judgment.
Justice Steigmann specially concurred.

**ORDER**

¶ 1    *Held*:    (1) On a challenge to the sufficiency of the evidence to three of defendant's nine convictions, the convictions are upheld as they were proven beyond a reasonable doubt.

(2) As the State concedes, one of the convictions for theft of services is reduced from a felony to a Class A misdemeanor.

(3) Defendant has not established the trial court committed plain error when it privately reviewed an audio recording of defendant's sworn statements from a bankruptcy proceeding.

(4) Defendant has not established he was denied the effective assistance of counsel when his sentencing counsel failed to challenge restitution ordered for debts discharged in bankruptcy.

(5) The restitution order to Phoenix Insulation, Inc., is vacated as defendant was found not guilty of theft of property from Phoenix Insulation, Inc.

¶ 2        After a bench trial, defendant, Chuck Duckworth, was convicted of multiple

counts of both theft of services (720 ILCS 5/16-3(a) (West 2014)) and theft of property

exceeding $500 (720 ILCS 5/16-1(a)(2)(A) (West 2014)) and one count of theft of property

exceeding $10,000 (720 ILCS 5/16-1(a)(2)(A) (West 2014)). Defendant was sentenced to

probation and ordered to pay restitution to the victims of those offenses. Defendant appeals,

arguing (1) multiple convictions must be vacated as the State failed to prove his guilt beyond a

reasonable doubt; (2) his conviction for theft of property over $500 from Contractor Services of

Illinois, count VIII, must be reduced to misdemeanor theft as the State failed to prove the value

of the taken property; (3) defendant's right to be present at all critical stages of his trial was

violated by the trial court's private listening to an audio recording of bankruptcy proceedings;

(4) he was denied the effective assistance of counsel when his trial counsel, at sentencing, failed

to argue the restitution order was improper as those debts were discharged in federal bankruptcy

proceedings; and (5) the restitution order to Phoenix Insulation, Inc., should be vacated as

defendant was acquitted of the count involving that business. We affirm as modified, vacate in

part, and remand with directions.

¶ 3                              I. BACKGROUND

¶ 4        In December 2013, defendant purchased a building located at 114 North

Kentucky Avenue in downtown Rantoul, Illinois (Kentucky Building). The Kentucky Building

was an old brick building, formerly housing a hardware store on the first floor and unfinished

storage space on the second floor. Defendant intended to renovate the Kentucky Building with a

storefront on the first floor and residential space on the second floor.

¶ 5        In July 2014, defendant acquired a "microloan" from the Village of Rantoul for

$50,000. The Village of Rantoul created the Village of Rantoul Microloan Program to assist in the rehabilitation of downtown Rantoul by providing low-cost funding to small businesses for real estate improvement. The maximum amount a debtor could acquire under the program was $50,000.

¶ 6       To complete the renovation of the Kentucky Building, defendant hired multiple contractors. Beginning in late summer or early fall 2014 and continuing through approximately March 2015, various contractors worked on renovating the Kentucky Building. Multiple contractors submitted defendant invoices that defendant did not pay.

¶ 7       In June 2015, defendant petitioned for bankruptcy under Chapter 7 of the United States Bankruptcy Code (Bankruptcy Code) (11 U.S.C. § 101 *et seq.* (2014)). A few months later, the bankruptcy court discharged defendant's debts to his creditors, including the contractors involved in the rehabilitation of the Kentucky Building.

¶ 8       The State, in March 2016, charged defendant with 14 counts of theft of property or services related to the renovation of the Kentucky Building: count I, theft of services having a value exceeding $300 from Waters Electrical Contracting, Inc. (720 ILCS 5/16-3(a) (West 2014)); count II, theft of property having a value exceeding $10,000 from Waters Electrical Contracting, Inc. (720 ILCS 5/16-1(a)(2)(A) (West 2014)); count III, theft of services having a value exceeding $300 from Davis Floor Sanding and Refinishing (720 ILCS 5/16-3(a) (West 2014)); count IV, theft of property having a value exceeding $500 from Phoenix Insulation, Inc. (720 ILCS 5/16-1(a)(2)(A) (West 2014)); count V, theft of services having a value exceeding $300 from Good Vibes Sound, Inc. (720 ILCS 5/16-3(a) (West 2014)); count VI, theft of property having a value exceeding $500 from Good Vibes Sound, Inc. (720 ILCS

- 3 -

5/16-1(a)(2)(A) (West 2014)); count VII, theft of services having a value exceeding $300 from New Age Home Improvement, Inc. (720 ILCS 5/16-3(a) (West 2014)); count VIII, theft of property having a value exceeding $500 from Contractor Services of Illinois (720 ILCS 5/16-1(a)(2)(A) (West 2014)); count IX, theft of property having a value exceeding $500 from Herr Kids, Inc., d/b/a/ Classic Granite and Marble (720 ILCS 5/16-1(a)(2)(A) (West 2014)); count X, theft of services having a value exceeding $300 from Victor Treat and Sons, Inc. (720 ILCS 5/16-3(a) (West 2014)); count XI, theft of services having a value exceeding $300 from ServPro of Clinton (720 ILCS 5/16-3(a) (West 2014)); count XII, theft of services having a value exceeding $300 from Miracle Method (720 ILCS 5/16-3(a) (West 2014)); count XIII, theft of property having a value exceeding $500 from Custom Flooring (720 ILCS 5/16-1(a)(2)(A) (West 2014)); and count XIV, theft of property having a value exceeding $10,000 from Lanz Heating and Cooling (720 ILCS 5/16-1(a)(2)(A) (West 2014)).

¶ 9                                    A. Defendant's Trial

¶ 10        A bench trial was held in April 2017. Below is a summary of the evidence regarding the charges at issue in this appeal. We note defendant was acquitted of counts I, II, IV (the count pertaining to Phoenix Insulation, Inc.), XII, and XIII.

¶ 11                    1. *Count III, Davis Floor Sanding and Refinishing*

¶ 12        Danny Lee Davis testified he met defendant on November 24, 2014, at the Kentucky Building. Defendant wanted the floors on the entire second floor refinished. Defendant told Davis that payment would be through a village loan; defendant mentioned no other source of payment. Davis provided an estimate to defendant. Davis Floor Sanding and Refinishing did not begin working on the Kentucky Building after the initial estimate.

- 4 -

¶ 13        Davis and defendant met a second time on January 19, 2015. Defendant's plans

for refinishing the floors changed, leading to a more expensive estimate. When Davis informed

defendant of the increased cost, defendant said "that was no problem because he had $31,000 set

aside for floor work." For the work to the scale of defendant's request, Davis would have

considered requiring a deposit. Davis did not do so for the Kentucky Building because defendant

told him that he had $31,000 set aside for flooring. After the work was completed, defendant did

not pay Davis.

¶ 14                    2. *Counts V & VI, Good Vibes Sound, Inc.*

¶ 15        Michael Roy, a manager at Good Vibes Sound, Inc. (Good Vibes), testified

defendant entered his store in September 2014, wanting some audio and video work done on the

Kentucky Building. Initially, defendant stated he wanted to rehab a second floor for living

quarters and a first floor for retail space. Defendant wanted in-ceiling speakers with an audio

receiver. Generally, Good Vibes requested money before such an installation. Good Vibes did

not do so for defendant, however, because defendant said he procured a loan through the Village

of Rantoul for $50,000 to cover the installation and equipment Good Vibes would provide.

¶ 16        Good Vibes invoiced defendant in January 2015 for $1403.92 worth of

equipment. At that time, defendant was not billed for services as billing for services would occur

when the job was completed.

¶ 17        Roy testified the second round of equipment and installation included a speaker

selector, television mounts, a subwoofer, and some wiring (see Exhibit 17B). In April 2015, Roy

invoiced defendant for the labor. Around this time, defendant also ordered another receiver and a

speaker placement on the mezzanine level. At this point, Roy became concerned about payment.

On May 10, 2015, Roy contacted the Village and the Bank of Rantoul. He learned no money was available.

¶ 18         Steve Suderman, the owner of Good Vibes, testified he went to the Kentucky Building on May 10, 2015, to attempt to repossess equipment they installed. After he could not enter the building, he contacted the number on file for defendant. He spoke to a person identifying himself as defendant, who stated he would allow them to reclaim the equipment and walk away from the installation. They agreed to do so at the end of that week or the next week. However, defendant later called back and said he was unwilling to do so.

¶ 19                          3. *Count VII, New Age Home Improvement*

¶ 20         Ryan Stitt, formerly a general contractor and sole proprietor of New Age Home Improvement (New Age), testified he worked on the Kentucky Building from June or July through December 2014. New Age performed framing work, installed drywall, built stairs, performed metal installation and demolition, and repaired flooring. Stitt testified defendant found him online, asking for a quote on putting in an upstairs balcony. The two discussed how payments would be made. Stitt would deliver invoices "and he would—I don't know if it was funded through the—through the City of Rantoul or if they signed off with the bank, but he would have to take the invoice." Defendant mentioned the source of payment was a microloan fund. Defendant did not mention he expected to receive an inheritance or insurance settlement. Defendant also mentioned he received some money from his father. Stitt did not remember details from the conversation. For his early work, through August 2014, Stitt was paid promptly. Stitt was not paid for an invoice dated October 6, 2014, for "hanging, finishing, sanding, drywall." The invoice did not separate charges for labor and materials. The two were treated the

same on the invoice. Stitt and defendant had an arrangement for payment of that invoice. Defendant paid for the material, which was drywall and insulation. He made a partial payment for labor. Stitt was to receive the rest of the payment at the end of the job. Stitt believed he would be paid from the village loan fund. Defendant initialed and dated the outstanding balance.

¶ 21     According to Stitt, defendant failed to pay the December 18, 2014, invoice. When Stitt gave defendant the invoice, defendant first said he paid for the work and refused to give Stitt more money. Then, defendant said he had no more money to give him. Stitt testified he would not have extended services on credit to defendant had it not been for the village loan fund.

¶ 22          4. *Count VIII, Contractor Services of Illinois*

¶ 23     Arlyn Rudin, a partner and subcontractor for Contractor Services of Illinois (Contractor Services), testified Contractor Services installed whole house, central vacuum systems; closet organizers; shower glass; mirrors; and bath accessories. Defendant called Contractor Services in late November 2014 seeking to have a central vacuum system installed in the Kentucky Building. Rudin met defendant at the job site. Later, defendant discussed having closet organizers installed. When Rudin asked defendant how to invoice him, defendant said he was getting money from a grant from the Village of Rantoul. It was important for Rudin to establish how payment would be made as defendant was not a contractor they worked with regularly. Rudin wanted to know how defendant would pay for the work. Because defendant said the money was coming from the Village of Rantoul, Contractor Services did not require payment in advance. Defendant mentioned no other source for payment.

¶ 24     Rudin testified installation was difficult, as the building was old. Contractor Services charged defendant $2250 for installation of the central vacuum system. Contractor

Services charged defendant $3895.85 for installation of the closet organizers. Defendant paid for neither.

¶ 25                    5. *Count X, Victor Treat & Sons, Inc.*

¶ 26        Victor Treat testified defendant approached him in September 2014 to install drywall on three levels of the Kentucky Building. At that time, the building was "in pretty sad shape." Treat provided an estimate of $16,750. Defendant did not accept that estimate. In January 2015, defendant contacted Treat again to ask for a new estimate. By that point, the building "looked a lot better." A good portion of the drywall had been installed. Defendant told Treat he and his brother had installed the drywall. Defendant said his brother, however, had other obligations and could not complete the work. Treat provided an estimate. Treat initially told defendant he would need half of the money as a down payment. Defendant told Treat he could not do that. Treat asked how he would be paid. Defendant responded he would pay Treat from "a grant or something through the [Village] of Rantoul." Treat was a little skeptical about the source of payment. He talked to some of his other customers in town and confirmed defendant had received a loan through the Village of Rantoul. Treat did not know the amount of the loan.

¶ 27        Treat testified he put a finish coat on the existing drywall and installed drywall in areas that were not completed. The price for this work was $8250. Treat sent defendant a February 9, 2015, invoice for this work. Defendant responded by telling him the Village of Rantoul performed an inspection and wanted more work done on the first floorl before it would release the funds. Treat agreed to perform additional work, installing drywall in a small bathroom. Treat sent defendant an April 13, 2015, invoice for $850 for the additional work. Defendant did not pay Treat.

- 8 -

¶ 28                          6. *Count XI, ServPro of Clinton*

¶ 29          Richard Roth, owner of ServPro of Clinton (ServPro), testified defendant contacted his business to perform work on the Kentucky Building. Roth met defendant on May 19, 2015. At that time, the second floor, "[o]ther than being dusty *** was a beautiful setup." When one walked up the stairs, there was a bedroom and a bathroom. To the right was a sliding barn door that opened to a great room with a kitchen, living room, and dining room. Televisions had been hung. There was also a "dumbwaiter type of elevator system." Defendant hired ServPro to do a postconstruction cleanup, specifically cleaning the dust from the floor that had been sanded. Defendant told Roth the flooring company had agreed to pay for the cleanup once ServPro sent them the bill. According to defendant, the flooring company wanted to see the bill to determine whether it would pay out of pocket or submit a claim to their insurance company. On May 21, 2015, a contract was signed and ServPro began work on the Kentucky Building. The total cost for the work was $4445.30. Defendant did not pay ServPro. Defendant identified no other source of payment other than the flooring company.

¶ 30                          7. *Count IX, Classic Granite & Marble*

¶ 31          Richard Herr, owner of Classic Granite & Marble, testified defendant entered his showroom in the summer of 2014, asking about kitchen countertops to be installed in the Kentucky Building. Defendant contracted with Classic Granite & Marble in December 2014. The amount of the bid agreed upon by defendant was $8255. Generally, Classic Granite & Marble required a 50% deposit. That was "whited out" on the contract, as defendant had a loan through the Village of Rantoul. Herr testified defendant told him the work had to be done first and then the Village would inspect the work and issue a check "in full." Defendant told Herr the Village

would not issue a partial payment. Defendant identified no other source of payment.

¶ 32 Herr explained he visited defendant at the Kentucky Building during the fall of 2014 and noticed the cost of the work done exceeded $50,000. Herr said the Kentucky Building "was a very nice place." When they stopped at the middle level, defendant told him it was going to be a theater room. Herr said, "you obviously didn't do this for $50,000." Defendant responded Herr was correct. Defendant assured Herr "he saved the $50,000 for the flooring and the countertops [because] he felt like those were the two most expensive things that he was doing." Defendant mentioned no other source of income for the granite work. Herr noted defendant did say he had a cleaning business.

¶ 33 Defendant was sent an invoice for the granite work in March 2015. Defendant told Herr he submitted the bill to the Village, which was in the process of "doing the collections." At some point, Herr received a call from defendant. Defendant told him there was to be a report on the news about some contractors not being paid and the Village had revoked his loan. Defendant further told Herr he was the victim of identity theft.

¶ 34 On cross-examination, Herr testified Classic Granite & Marble had earlier completed work on a house defendant owned in Rantoul. Defendant paid for that work.

¶ 35 8. *Count XIV, Lanz Heating and Cooling*

¶ 36 Jacob Farmer, a comfort consultant for residential sales for Lanz Heating and Cooling, testified defendant, in 2014, called the Lanz Heating and Cooling sales coordinator to make an appointment to discuss improvements at the Kentucky Building. On August 22, 2014, Farmer met defendant at the Kentucky Building. Defendant wanted to make the second floor of the building a residential space. For the mezzanine level, defendant was considering office space.

Lanz Heating and Cooling installed two ductless units. On the second floor, defendant wanted a system for the great room with a family area and a kitchen as well as a system for the bedroom, master-suite area. On August 26, 2014, Farmer presented the plan to defendant. At that time, they discussed payment. Defendant told Farmer about the loan he was getting from the Village of Rantoul. He further told Farmer about the other projects defendant had completed. The two looked at video of the other projects.Defendant told Farmer the Village of Rantoul was giving him a loan for his work as he was restoring an older historical building.

¶ 37 The first invoice was sent to defendant on September 19, 2014, after 90% of the work had been completed. Lanz Heating and Cooling requested 90% of the payment for that work. The total for the project was $28,120.

¶ 38 Normally all proposals from Lanz Heating and Cooling require a down payment of 50% with the rest due upon completion. In this case, Farmer did not require the down payment "[b]ecause [defendant] had mentioned the Village of Rantoul loan." Farmer also stated: "[Defendant] had mentioned that he had done this before, and it seemed like a very noble cause I thought at that time. And then on top of that, I was required to meet another time with what I expected to be two gentlemen from the Bank of Rantoul. They had me walk through and show them exactly what we were going to do before the work was even begun." The two men wanted to know about the scope of the work. This meeting occurred the week before work began, in September 2014. Defendant further told Farmer the bank would not release funds until the work was completed.

¶ 39 According to Farmer, defendant identified no other source of funds for payment. Defendant had mentioned he owned a cleaning business in the context of scheduling meetings

- 11 -

and installation. Defendant signed the August 27, 2014, estimate for $28,120. In October and early November, Lanz Heating and Cooling did plumbing work for defendant, amounting to $6525. By this point, 90% of the work was completed. All of the work was to be done by December 1, 2014. Defendant told Farmer "there had to be a final walkthrough from the bank after all of the work was done before they would pay."

¶ 40    Troy Lanz, owner of Lanz Heating and Cooling, testified Lanz Heating and Cooling did not require a deposit for work at the Kentucky Building because of the involvement of the Bank of Rantoul. In January or February 2015, defendant said he would give Lanz $2000, but defendant did not do so. No payment was made by defendant to Lanz Heating and Cooling. Lanz testified his business lost $5109 in labor charges and $26,724 in equipment charges.

¶ 41    9. *Village of Rantoul*

¶ 42    Daniel Culkin, the director of the inspection department for the Village of Rantoul, testified he was asked in July 2014 to oversee and verify expenditures of the $50,000 loan to defendant. This process involved the owner of the property delivering a bill or statement for work that was being done. Culkin would then go to the property, verify the work was completed, and initial the statement or bill or contact the bank officials to authorize payment. Culkin's role did not include approving whether expenditures were appropriate. Vendors did not need to wait until the project was finished to submit an invoice for payment. They could perform the work in phases.

¶ 43    According to Culkin, when he first visited the Kentucky Building to oversee defendant's expenditures, the building was, zoning-wise, a commercial district property. The property was in "rough condition." It was not finished above the first floor. Culkin had regular

- 12 -

contact with defendant. Defendant submitted an invoice from New Age, which Culkin approved. For that invoice, Culkin contacted the bank representative to authorize payment. When Culkin was shown two other invoices for work performed by New Age, Culkin testified defendant did not submit those invoices for payment.

¶ 44        Culkin testified defendant had not submitted invoices for Contractor Services, Davis Floor Sanding and Refinishing, Classic Granite and Marble, Lanz Heating and Cooling, Custom Flooring, ServPro, Victor Treat and Sons, Good Vibes, Phoenix Insulation, Inc. (Phoenix Insulation), Waters Electrical Contracting, or Miracle Method of Central Illinois.

¶ 45        Around September 2014, Culkin became concerned about the amount of money left in the loan fund. A large payment had been made to Roto-Rooter and "something like $12,000" remained. This concerned Culkin because he knew other bills were coming due, including an estimate provided from Lanz Heating and Air Conditioning for around $28,000.

¶ 46        On cross-examination, Culkin testified the Bank of Rantoul made the payments after receiving verification from Culkin. Culkin did not know how the bank dispersed the payments. He did not see any of the checks.

¶ 47                                   10. *Bank of Rantoul*

¶ 48        Craig Rogers, a commercial loan officer for the Bank of Rantoul, described the process of the microloan program. Under the program, the Village approved loans to individuals and the Bank of Rantoul serviced the loans. The Village's loan funds were tracked via "paper trail." According to Rogers, "The village would give us a check for a dollar amount. After disbursements to the customer *** or person, we would then take the remaining funds into another cashier's check until the next draw request." Rogers agreed "instead of having numbers

- 13 -

on a computer account, you physically draft a cashier's check for the balance and then replace it with a new one each time there is a disbursement" because the money was not the bank's money and that was how the bank kept track of the remaining amount left on the loan.

¶ 49       Rogers testified the bills would go to either the Village of Rantoul or to himself. If Rogers received a bill, the Village would sign off on the bill before funds were disbursed. If the bills went to the Village, the Village would contact the bank and tell them to disburse the funds. Culkin was the contact with the Village. Rogers was not aware of any disbursement made without defendant's and the Village's approval.

¶ 50       According to Rogers, defendant's loan was for $50,000. Each time a disbursement was made, Rogers confirmed the outstanding balance with defendant. A State's exhibit shows the balance of the loan was $50,000 when it was new as of July 9, 2014. As of September 3, 2014, only $17,500 remained. As of October 7, 2014, only $8170.70 remained available to defendant. Three days later, approximately $3700 remained. By January 16, 2015, that number was approximately $900. At no point did Rogers receive an invoice for payment for Custom Flooring, Hesterberg Electric, Good Vibes, Miracle Method of Central Illinois, Victor Treat and Sons, Davis Flooring Sanding and Refinishing, Phoenix Insulation, Contractor Services, Waters Electric Contracting, Lanz Heating and Cooling, Classic Granite and Marble, or ServPro.

¶ 51       Dennis Long, chairman of the board of the Bank of Rantoul, testified he sat on the committee that reviewed and approved loans through the Village of Rantoul Microloan Program. Defendant applied for the loan in 2014 after he acquired the Kentucky Building. The Kentucky Building was the old Litchfield Hardware building. Defendant wanted to do extensive remodeling with plans to rent the first floor as commercial space and reside on the second floor.

Defendant requested a loan for $50,000, the maximum amount allowed under the program. The loan was "closed-end credit," meaning the loan would not be readvanced.

¶ 52    In the course of applying for the loan, defendant informed Long of his sources of income. Defendant's tax returns showed income from a cleaning business. Defendant also received disability income from social security. The funds from the microloan were to be spent on rehabilitating structural issues within the Kentucky Building. At no point during the conversations regarding defendant's income did defendant mention anticipating an inheritance or insurance settlement. He also did not mention a payment related to a child-support obligation.

¶ 53    Long testified defendant had rehabilitated an old church in Rantoul. Defendant sold that property, and the committee understood the proceeds from that sale went to purchase the Kentucky Building and rehabilitation of that building.

¶ 54    Long testified regarding an incident where he received a phone call from a plumbing contractor inquiring as to the availability of funds to be paid on work he had done for defendant. Long told the contractor the funds were available at that time. Defendant approached Long the next day. Defendant was "rather irate" Long had told the man funds were available. On September 3, 2014, a $17,500 payment was issued to Roto-Rooter.

¶ 55                          11. *Defendant's Testimony*

¶ 56    Defendant testified he had lived in Rantoul since 2010. He owned a cleaning business, which did janitorial work for offices and factories. At the time of his testimony, defendant's cleaning business had no employees.

¶ 57    Defendant had building and renovation experience. In 2001, he and his then-wife constructed a house. For that project, defendant acted as a general contractor and hired multiple

- 15 -

contractors. The contractors were paid for their work. Defendant and his wife resided there for five years until they divorced. Defendant then purchased a church in Rantoul and renovated the building into a residence. He hired contractors to complete the project and lived there for three years before selling it in 2013.

¶ 58        When defendant purchased the Kentucky Building in December 2013, he had a plan in place to pay for the renovation. Defendant used $84,000 in proceeds from the sale of the church to purchase the building. He intended to use proceeds from that sale to purchase materials such as appliances, toilets, lights, and drywall. To further help finance the renovation, defendant applied for a microloan from the Village of Rantoul. His intent was to use microloan proceeds for brick work, plumbing, and some materials. Defendant's renovation plans included $175,000 he believed he would receive from his father's estate. Defendant's father told defendant he would leave him $175,000 upon his death. Defendant's father died in December 2012. As of the date of his testimony, defendant had not received any money from his father's estate. Defendant believed he was going to, as his "grandmother was to distribute it to [him] for the purchase of another property." Defendant intended to use that $175,000 for the larger jobs, such as floor sanding, insulation, countertops, air conditioning, and electrical work.

¶ 59        Defendant testified regarding the rules of receiving the microloan. At the June 2014 meeting regarding his loan, defendant took notes. Defendant was told he had to hire licensed contractors and inform the contractors that he had been approved for the microloan. Defendant told everyone about the loan because he was instructed to do so. The microloan appeared in the newspaper in 2014. More than half of the contractors contacted defendant after the information was published in the paper, including Stitt from New Age. Defendant could not

- 16 -

name other contractors who initiated contact with him. There were "so many people," about six. Defendant denied telling any of the contractors they would receive payment from the loan. Defendant told the contractors he would pay them from the inheritance.

¶ 60         In November 2014, a television producer contacted defendant, asking him if he would be interested in doing a reality show rehabbing commercial properties into homes. The producer saw some photos on Facebook. The two reached an agreement. Defendant told all of the contractors about the reality show, some of whom were interested in participating. Specifically, defendant identified Davis and Hess as having been recorded for the show. The show had not been produced, but defendant wanted to pursue it.

¶ 61         Defendant testified regarding the $175,000 he expected to receive from his father. He had several conversations with his mother, stepmother, and grandmother about the money. He and his stepmother, Lisa Brown, had multiple conversations in December 2014. Lisa wrote defendant a letter explaining she had health issues and would contact defendant's grandmother to try to take care of things in a timely manner. Defendant's grandmother visited defendant four times at the Kentucky Building. The first time was in December 2013, shortly after defendant purchased the property. She returned in November 2014 to see the progress. His grandmother wanted to follow his father's wishes to continue with defendant's project. Defendant first suspected a problem with the money in April 2015. Defendant's grandmother stopped returning his calls. His uncle would not allow him to see her. In March 2016, defendant learned his grandmother was in a nursing home. He visited her there. She did not recognize him. Defendant knew he was not going to receive the money from his father.

¶ 62         Contractors began to file liens against the property. After a news story appeared

on television regarding the Kentucky Building, a lawyer called defendant and recommended he file for bankruptcy.

¶ 63        On June 17, 2015, defendant filed a voluntary petition for bankruptcy under Chapter 7 of the Bankruptcy Code (11 U.S.C. § 101 *et seq.* (2008)). In his petition, he estimated his assets as valued between $0 and $50,000 and his liabilities between $100,001 to $500,000. On September 28, 2015, defendant was granted a discharge in bankruptcy. On the back of the order was a general summary of the bankruptcy discharge. The order specifically stated that "most fines, penalties, forfeitures, or criminal[-]restitution obligations" were not debts discharged in bankruptcy proceedings.

¶ 64        On cross-examination, defendant testified he was present when his father signed a will leaving him $175,000. Defendant was told the money was in bonds, which were kept in a safe at his grandmother's house. Defendant's name was on the bond. When asked why he did not gain possession of the bonds upon his father's death, defendant said it was his grandmother's intent to honor his father's wishes. The money would be used toward the purchase of another property.

¶ 65        At no point during the process of applying for the microloan did defendant tell the lenders about the inheritance "because [he] had not received it." Defendant denied telling contractors the loan was his only source to pay them.

¶ 66        In January 2014, defendant's grandmother gave him $10,000 to purchase a mobile home for him to reside in. In 2008 or 2009, his grandmother gave him $30,000 to purchase a vehicle.

¶ 67        On examination by the trial court, defendant testified he did not know if the will

- 18 -

had been probated. Defendant testified he paid his grandmother back for the $30,000 she gave him for the car. Defendant affirmed he was required by the microloan committee to tell contractors he had the loan; he did not have to tell them they would or would not be paid from the loan.

¶ 68                                    12. *Rebuttal Evidence*

¶ 69         The State called multiple witnesses in rebuttal. Davis testified it did "kind of ring a bell" about the possibility of a reality television show. Davis, however, testified at no point was it agreed part of his compensation came from the exposure he would get on the television show. Davis reported defendant told him he would be paid through the loan. According to Davis, defendant also stated, "When you're done the bank will come in and inspect the work's done and you'll be paid."

¶ 70         On examination by the trial court, Davis testified he did not agree to be filmed or interviewed for the television show, stating "[t]hat was not even discussed." He did not believe he was video recorded.

¶ 71         Long testified, during his two or three conversations with defendant regarding applying for the microloan, he did not tell defendant contractors had to be told of the existence of the loan. Long was aware of no such requirement and he was present at every meeting of the loan committee that defendant attended. Long did not hear any member of the committee tell defendant of such a requirement. Although he could not recall every conversation with defendant, Long testified he would have remembered a conversation involving the alleged requirement as "it's so unusual, I would remember if I did it."

¶ 72         Rogers and Culkin also testified of not being aware of any such requirement.

¶ 73　　　　　The State sought to enter into evidence an audio recording of defendant's sworn statements during bankruptcy proceedings. The proceeding was a meeting of the creditors and defendant's statements were made under oath. After defense counsel agreed to the trial court listening to the nearly hour-long recording in chambers, and a four-week adjournment of the trial, the trial court listened to the audio recording.

¶ 74　　　　　At the bankruptcy proceeding, defendant testified to the following: He received a letter dated February 24, 2015, signed by his stepmother Lisa. Earl Brown was defendant's biological father. He died in August 2012. Earl had an insurance policy he promised defendant would receive. Lisa was listed as the beneficiary. Defendant was not listed as a beneficiary. Defendant stated he was to receive half of the funds or $150,000. There was nothing in writing. Defendant had not seen the insurance policy. Defendant did not know why he had not received the money. He did not know if he would. Whenever he asked Lisa about the money, she would "break down" or say, "I've been busy." Defendant testified he had not seen a will. He believed there was no will. He did not know if probate proceedings were started in Ohio upon Earl's death. Lisa told defendant she had not received any money.

¶ 75　　　　　Defendant testified he believed he would receive his inheritance. Defendant said the only way he could cover the payments to the contractors was with that money. Earl had eight children. None of the other children were promised any proceeds from the life insurance. Lisa knew defendant bought the Kentucky Building and planned to renovate the building. Defendant stated the Kentucky Building property was worth $34,000.

¶ 76　　　　　Defendant testified he received $160,000 from the sale of the church property. He believed $42,000 to $45,000 remained on the mortgage. There were no other liens or secured

loans. Defendant paid $35,000 for the Kentucky Building.

¶ 77 Work had been done on the first floor of the Kentucky Building, including demolition work and removing plaster from the walls. Molina Masonry had been paid for the work from the microloan. Hesterberg Electric installed some electrical conduit but was not paid for the work. The only other work done at the time of the bankruptcy proceedings was painting by "Brad." Defendant paid "Brad" `a "couple hundred dollars" from defendant's cleaning business proceeds. Later, however, defendant stated Brad had not yet started painting.

¶ 78 Defendant was living in the building at the time of the bankruptcy proceedings. He denied receiving letters from the Village of Rantoul telling him he could not live in the residence. Defendant made payments on his mortgage. When told the construction permit for the Kentucky Building expired, defendant stated he no longer needed one as there was no work left to be done.

¶ 79                                    B. Verdict

¶ 80 The trial court found no dispute defendant received the goods and services as alleged in the complaint and he failed to pay fully for all of them. The court found defendant "clearly intended to permanently deprive the respective owners of the use or benefit of the property." The court thus noted the sole issue in dispute was "whether [defendant] knowingly obtained these goods and services by deception." The court found the reasonableness of any belief defendant would obtain anything from his father in terms of inheritance "was fading by the fall of 2014 when the bulk of the project, at least that part that is subject to the 14 counts of the complaint in this case, was alleged to have taken place." The court further found incredible defendant's testimony the funds from his previous rehab project were to be used. The court noted

it listened to the audio recording of defendant's testimony from the bankruptcy proceedings, when defendant was questioned "thoroughly" regarding "the disposition of the funds from the sale" and defendant's explanation "was confusing and vague at best." The court addressed each count individually and found defendant not guilty of a number of counts upon finding no evidence in those counts to show defendant obtained those goods or services through deception. This included count IV, by which the State alleged defendant committed theft of property exceeding $500 in value from Phoenix Insulation, Inc. The court found defendant guilty of counts III, V, VI, VII, VIII, IX, X, XI, and XIV.

¶ 81                                C. Sentence

¶ 82        At the sentencing hearing, the State requested a prison sentence of five years and an order of restitution in the case. Defense counsel began argument by stating he was saddened by the State's request for five years. Counsel argued the following:

> "I said from the onset, you know, [defendant] should be
> held liable in terms of, you know, paying these contractors back.
> But right now we have a criminal justice that has 2.3 million
> people incarcerated, your Honor, and if there is anyone deserving
> of the opportunity to not go inside of a prison or a jail, it's
> [defendant]. Prison doesn't get you better. ***
>
> [Defendant] goes away for five years, the building is gone.
> No one has it, right? It's absolutely gone."

Counsel further argued, "I would hope that even the contractors themselves don't want to see this man go to prison. Yeah, they want to be paid back, but to see him go to prison?"

¶ 83    The trial court sentenced defendant to probation. On counts III, V, VII, X, and XI, which were convictions for theft of services having a value of over $300, defendant was sentenced to 12 months' probation. For counts VI, VIII, and IX, convictions for theft of property exceeding $500, defendant was sentenced to 30 months' probation. On count XIV, defendant was sentenced to 48 months' probation. The trial court also ordered defendant to pay $95,331.10 in restitution. Of this amount, $3322 was ordered to be paid to Phoenix Insulation.

¶ 84    This appeal followed.

¶ 85                     II. ANALYSIS

¶ 86                     A. Sufficiency of the Evidence

¶ 87    Defendant first challenges his convictions for counts III, VII, and VIII, alleging the State failed to prove beyond a reasonable doubt he knowingly obtained services or products by deception. Defendant's conviction on count III was for theft of services having a value exceeding $300; defendant's convictions on counts VII and VIII were for theft of property having a value exceeding $500.

¶ 88    Upon a challenge to the sufficiency of the evidence to support a criminal conviction, this court considers the evidence "in the light most favorable to the prosecution" and determines whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Ward*, 215 Ill. 2d 317, 322, 830 N.E.2d 556, 559 (2005). In this undertaking, we examine the record as a whole and not simply the evidence supporting the State's theory of the case. See *People v. Wheeler*, 226 Ill. 2d 92, 117-18, 871 N.E.2d 728, 742 (2007).

¶ 89                     1. *Count III, Theft of Services*

- 23 -

¶ 90        As to count III, defendant was convicted of theft of services from Davis Floor

Sanding and Refinishing (see 720 ILCS 5/16-3(a) (West 2014)). Under section 16-3(a) (720

ILCS 5/16-3(a) (West 2014)), one "commits theft when he or she knowingly obtains the

temporary use of *** services of another which are available only for hire, by means of threat or

deception or knowing that such use is without the consent of the person providing the ***

services." "Deception" is defined as to do the following "knowingly":

> "(a) Create or confirm another's impression which is false
>
> and which the offender does not believe to be true; or
>
> (b) Fail to correct a false impression which the offender
>
> previously has created or confirmed; or
>
> * * *
>
> (e) Promise performance which the offender does not
>
> intend to perform or knows will not be performed. Failure to
>
> perform standing alone is not evidence that the offender did not
>
> intend to perform." 720 ILCS 5/15-4(a), (b), (e) (West 2014).

Defendant cites case law establishing the offense of theft-by-deception requires proof the

defendant acted with "specific intent to defraud." See *People v. Reich*, 241 Ill. App. 3d 666, 667,

670, 610 N.E.2d 124, 125, 126-27 (1993) (citing Ill. Rev. Stat. 1987, ch. 38, ¶ 16-1(b)(1)). The

State does not contradict defendant's conclusion regarding the offense here, as theft of services

based on deception (see 720 ILCS 5/16-3(a) (West 2014)) also requires proof defendant acted

with specific intent to defraud Davis Floor Sanding and Refinishing.

¶ 91        Defendant argues there was no evidence the services of Davis Floor Sanding and

Refinishing were provided as a result of deception or defendant specifically intended to defraud the company. Defendant emphasizes, while Davis's testimony established defendant told Davis he would pay him from the proceeds of the microloan in November, when the decision was made to provide the services in January 2015, defendant said he had $31,000 set aside to pay for the refinishing but did not state those funds would come from the microloan. Defendant further emphasizes his testimony he believed he was to receive funds from his father's estate and he intended to pay Davis Floor Sanding and Refinishing from those funds.

¶ 92     We find the evidence, viewed in the light most favorable to the prosecution, sufficiently establishes defendant had the specific intent to defraud Davis Floor Sanding and Refinishing. That the microloan was not mentioned specifically in January 2015 does not render this element unproved. The testimony establishes on November 24, 2014, defendant told Davis the floors would be paid for through a village loan. He mentioned no other source of payment. When the two met again, less than two months later, he said $31,000 was set aside for floor work. Defendant did not tell Davis the flooring would be paid for through any other financial source. The failure to "correct a false impression which the offender previously has created" sufficiently establishes deception. 720 ILCS 5/15-4(b) (West 2014). While defendant testified he intended to pay for these services through an inheritance, the trial court plainly did not believe him. This conviction is upheld.

¶ 93                    2. *Count VII, Theft of Services*

¶ 94     Defendant next argues the evidence was insufficient to establish he intended to deceive Stitt and New Age and, therefore, his conviction for count VII was improper. Defendant emphasizes Stitt's decision not to require a deposit was not the product of deception. He focuses

on the fact defendant paid Stitt's invoices and performed his part of the agreement until the loan fund was nearly exhausted.

¶ 95       We disagree. The evidence establishes Stitt would not have agreed to perform the services had he not been told of the microloan fund. That defendant paid part of the invoices does not lead to the conclusion defendant intended to pay Stitt fully and, therefore, was not acting to deceive him. Instead, in the light most favorable to the State, this conduct shows defendant wanted New Age to continue working on the Kentucky Building. New Age performed work over several months. The July 24, 2014, invoice for "Site Work week 1," in the amount of $3500, was paid. The August 1, 2014, invoice for $1500 was also paid. New Age continued to work on the Kentucky Building, performing framing work, installing drywall, and building stairs. When presented with the October 6, 2014, invoice, defendant did not pay the entire invoice. Stitt and defendant worked out an agreement. Defendant paid for the materials and would pay for the labor when the work was completed. New Age continued to work. Defendant then refused to pay the December 18, 2018, invoice, totaling $5100, asserting no money was left. As defendant continued to have Stitt work for him, the microloan funds were dwindling and he was acquiring debt to other contractors, such as Contractor Services. As of October 10, 2014, when the agreement with Stitt was renegotiated, approximately $3700 of the microloan remained. The evidence sufficiently established the State proved beyond a reasonable doubt defendant intended to deceive Stitt and New Age to acquire services from them.

¶ 96                           3. *Count VIII, Theft of Property*

¶ 97                             a. Sufficiency of the Evidence

¶ 98       Defendant next argues the State failed to prove him guilty beyond a reasonable

doubt of theft of property from Contractor Services. Defendant argues there was no fraudulent representation on his part and no evidence the products Contractor Services provided were given as a result of that deception or that he had the specific intent to defraud Contractor Services. Defendant emphasizes Rudin, an owner of Contractor Services, stated, regarding the deposit, he "assumed that it would be taken care of."

¶ 99　　　　Defendant's emphasis on he "assumed that it would be taken care of" is misleading as Rudin expressly testified he would not have provided the property had he not been informed of the microloan and, after he asked how defendant "was getting the money," defendant said he was getting money from the Village of Rantoul. There is sufficient evidence from which it may be determined the misrepresentation was the reason Rudin and Contractor Services entered into the agreement with defendant and installed their equipment.

¶ 100　　　　In addition, there is ample evidence defendant had the specific intent to defraud Rudin. As of November 2014, when defendant first contacted Contractor Services to contract for over $6000 of goods and services, less than $3700 remained in the microloan. Defendant had failed to pay at least one other contractor (New Age in October 2014), and defendant continued to gain services and products from other contractors. There is ample evidence undermining defendant's alleged belief he would receive funds from his father's estate. No contractor stated defendant mentioned the inheritance as the means of paying for services. Earl died in December 2012, and defendant had not yet received funds from his father's estate. Testimony from the trial and the bankruptcy proceedings was inconsistent as to whether Earl had a will and whether the funds were from insurance proceeds or bonds. Given these inconsistencies, the trial court reasonably did not believe him.

- 27 -

¶ 101                                    b. Misdemeanor

¶ 102          Defendant argues, in the alternative, his conviction for count VIII should be reduced from a felony to a misdemeanor because the State failed to establish he stole property valued at more than $500, an element of the offense. Defendant acknowledges the exhibits introduced by the State show Contractor Services performed work on the Kentucky Building but emphasizes those exhibits fail to differentiate between the value of the property defendant was convicted of taking and the services provided. Defendant reasons, because there was no proof of the value of the property taken, an element of the offense, his conviction for theft of property exceeding $500 cannot stand and must be reduced.

¶ 103          Theft of property under section 16-1(a)(2) of the Criminal Code of 2012 (720 ILCS 5/16-1(a)(2) (West 2014)) is a Class 3 felony if the value of the property taken exceeds $500 but is less than $10,000 (720 ILCS 5/16-1(b)(4) (West 2014)). However, if the value does not exceed $500 and the theft of property does not occur "from the person," then the theft is a Class A misdemeanor. See 720 ILCS 5/16-1(b)(1) (West 2014).

¶ 104          The State concedes no evidence was presented to show the property involved in the installation of the vacuum system and shelving exceeded $500 and defendant's conviction should be reduced to a Class A misdemeanor. While evidence demonstrated the total owed to Contractor Services approached $6000, there was no division of the parts and labor.

¶ 105          We accept the State's concession the evidence was insufficient to prove beyond a reasonable doubt defendant committed theft of property over $500. See 720 ILCS 5/16-1(a)(2), (b)(4) (West 2014). We further accept both parties' concession the evidence is sufficient to establish misdemeanor theft. See 720 ILCS 5/16-1(a)(2), (b)(1). We therefore reduce defendant's

conviction from theft of property exceeding $500 to misdemeanor theft and remand the cause to the trial court for resentencing on the lesser charge. See *People v. Rowell*, 229 Ill. 2d 82, 101, 890 N.E.2d 487, 498 (2008) (reducing the conviction from felony retail theft to misdemeanor retail theft and remanding for resentencing).

¶ 106                        B. Defendant's Right to Be Present

¶ 107        Defendant next argues plain error occurred when his right to be present at all critical stages of trial was violated. Defendant contends the trial court's private listening to an audio recording of the bankruptcy proceeding, even with trial counsel's consent, denied him a fair trial. Defendant acknowledges the issue was not preserved for our review but asserts, under *People v. Lucas*, 2019 IL App (1st) 160501, 141 N.E.3d 341, we should reverse under the plain-error doctrine.

¶ 108        Under the plain-error doctrine, a clear or obvious error forfeited below may be remedied on appeal if (1) the evidence was closely balanced or (2) the error was sufficiently grave it affected the fairness of the trial and challenged the integrity of the judicial process. *People v. Thompson*, 238 Ill. 2d 598, 613, 939 N.E.2d 403, 413 (2010). The first task in plain-error analysis is consideration of whether a clear or obvious error occurred. *Id.* The burden of proving such error falls on defendant. *People v. Herron*, 215 Ill. 2d 167, 187, 830 N.E.2d 467, 479-80 (2005).

¶ 109        The clear or obvious error complained of allegedly occurred when the trial court, upon defense counsel's express agreement, listened to an audio recording of defendant's testimony during the bankruptcy proceeding. A defendant's general right to be present at all critical stages of criminal proceedings, from arraignment to sentencing, is guaranteed by both the

- 29 -

Illinois and United States Constitutions. *People v. Lindsey*, 201 Ill. 2d 45, 55, 772 N.E.2d 1268, 1275 (2002). Case law shows the analysis of whether a defendant has been denied the right generally involves two considerations: (1) whether the criminal proceeding at issue is a "critical stage" and (2) whether defendant's denial of that right is an error for which reversal is required. See *id.* (considering whether the jury waiver was a critical stage of proceedings); see also *Lucas*, 2019 IL App (1st) 160501, ¶¶ 5, 14 (evaluating whether defendant was denied her right to be present when a video of her arrest was viewed during trial outside her presence). Here, the parties do not dispute the trial court's listening to an audio recording of defendant's testimony occurred during a critical stage of proceedings. We note such an argument could reasonably have been made. See *People v. Groebe*, 2019 IL App (1st) 180503, ¶¶ 51-52, 145 N.E.3d 411 (finding the defendant's presence at the trial court's *in camera* viewing of a traffic stop and arrest during trial was not at a critical stage of the proceedings as the officer testified to the events and accuracy of the video and the defendant was able to cross-examine the officer and argue regarding the contents of the video); *People v. Richardson*, 2021 IL App (1st) 190821, ¶¶ 2, 61 (finding the defendant was not denied his right to be present when the trial court viewed videotaped evidence *in camera* during a pretrial hearing upon concluding the viewing did not occur at a critical stage of proceedings); *People v. Young*, 2013 IL App (4th) 120228, ¶¶ 24-25, 996 N.E.2d 671 (same); *cf. Lucas*, 2019 IL App (1st) 160501, ¶ 5 (distinguishing *Young* on the basis the *in camera* viewing of the video was for the purposes of establishing admissibility at trial and not the "actual offer as substantive evidence"). However, because such argument was not raised or countered and the matter may be readily resolved based on consideration of whether defendant was denied a fair trial, we make no determination on this ground.

¶ 110       The Supreme Court of Illinois has held "even where a defendant has the general right to be present because the proceeding is a 'critical' stage, a defendant's absence is not a *per se* constitutional violation" and "a defendant's absence from such a proceeding will violate his constitutional rights only if the record demonstrates that defendant's absence caused the proceeding to be unfair or if his absence resulted in a denial of an underlying substantial right." *Lindsey*, 201 Ill. 2d at 57. The question of whether the fairness of the trial was affected by the defendant's absence from part of the trial must be considered based on the record as a whole. *Id.* We note defense counsel cannot waive a defendant's right to be present on the defendant's behalf. See *People v. Lofton*, 194 Ill. 2d 40, 66, 740 N.E.2d 782, 797 (2000).

¶ 111       Defendant contends, under *Lofton*, reversible error is established when the record as a whole shows "the defendant's presence at the proceeding would have contributed to his opportunity to defend himself against the charges." *Id.* at 67. Defendant maintains his presence at the listening to the audio recording would have unquestionably allowed him to contribute to his defense.

¶ 112       Defendant's argument is based on a misapplication of *Lofton*. In *Lofton*, the court was asked to determine whether defendant was denied his right to be present during a hearing conducted pursuant to section 115-10(b)(1) of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10(b)(1) (West 1996)), a hearing to determine whether to admit an out-of-court statement by an alleged victim of predatory sexual assault. See *Lofton*, 194 Ill. 2d at 62-64. The *Lofton* court considered whether "the defendant's presence at the proceeding would have contributed to his opportunity to defend himself against the charges" in deciding whether the hearing at issue occurred during a "critical stage." See *id.* at 73. After finding defendant's

presence would have contributed to his opportunity to defend himself, the court then turned to the question of whether defendant was denied a fair trial: "By the time trial began and [the] defendant was present to defend against the charges, it was too late for him to protest the admissibility of [the alleged victim's] hearsay statements, damaging in the extreme to his defense." *Id.* at 72. The court found reversal warranted after not only finding the defendant's presence would have contributed to his opportunity to defend himself but also after finding due process was denied:

> "Because the record indicates that defendant's presence at the section 115-10 hearing would have contributed to the fairness of the criminal proceeding against him *and* that a fair and just hearing was thwarted by his absence, we conclude that the section 115-10 hearing was a stage critical to the outcome of the criminal proceeding at which defendant had a right to be present. Hence, we are brought to the conclusion that defendant's absence resulted in his being denied a fair and just trial, thereby violating his due process right of presence." (Emphasis added.) *Id.* at 72-73.

¶ 113     Contrary to defendant's contention, *Lofton* shows defendant, to prevail, must establish both the alleged error occurred during a critical stage of proceedings, as defendant's presence would have contributed to the fairness of the proceeding, and he was denied a fair and just trial. We thus turn to the question of whether defendant has established he was denied a fair trial when the trial court listened to the audio recording in defendant's absence.

¶ 114     In his appellant briefs, defendant relies heavily on the decision in *Lucas* to support

his claim he was denied the right to a fair trial. In *Lucas*, a bench trial was held on the charges the defendant committed, among other offenses, driving under the influence of alcohol and misdemeanor resisting a peace officer. *Lucas*, 2019 IL App (1st) 160501, ¶¶ 1, 4. Before witnesses were called, the State sought to publish a video of the defendant's traffic stop captured by an officer's squad car. *Id.* ¶ 5. The parties stipulated to the authenticity of the video. *Id.* The trial court then addressed the defendant, telling her, because the courtroom did not have video capabilities, he would view the video in chambers in the presence of the attorneys. *Id.* The court asked the defendant if she understood and the defendant replied she did. *Id.* The court then recessed the proceedings to watch the video in chambers. *Id.* ¶¶ 5-6.

¶ 115          On appeal in *Lucas*, the majority found the defendant's right to be present was denied as the fairness of the proceedings was undermined when the defendant was unable to view the evidence against her and aid in her own defense. *Id.* ¶ 14. Notably, the court highlighted the fact the defendant could not hear or see the evidence presented in chambers and the evidence did not show the defendant "viewed the video before trial." *Id.* ¶ 16. The court further found the defendant's absence impacted a fundamental right; the right to testify on her own behalf. *Id.* ¶ 19. Because "[t]he violation of [the defendant's] right to be present had a cascading impact on fundamental rights," the majority found second-prong plain error and reversed the defendant's convictions. *Id.* ¶ 21.

¶ 116          In this case, there are marked differences in the underlying facts rendering the defendant's reliance on *Lucas* unpersuasive. First, the video in *Lucas* captured (1) an interaction between the defendant and a police officer and (2) the events leading to an arrest for driving while under the influence—events recorded from a point of view not shared by the *Lucas*

- 33 -

defendant. The *Lucas* defendant may not have observed events contained in the video recording and, because of the under the influence charges, may not have fully recalled or remembered others. In contrast, here, the audio recording was of defendant's sworn statements during a bankruptcy proceeding—an event of which defendant had firsthand knowledge and there is no indication he was "under the influence" at the time of the recording. Second, in *Lucas*, the record establishes the defendant learned of the trial court's decision to view the video recording in chambers immediately before it was to be viewed outside of her presence. *Id.* ¶ 5. Here, however, defendant had over four weeks between the notice that the audio recording would be heard outside his presence and the day the trial court listened to the audio recording. At the trial, on April 11, 2017, during the State's presentation of rebuttal evidence, the State indicated it would introduce the audio recording from the bankruptcy proceeding. The record shows the audio recording was produced during discovery. Defense counsel agreed to the State's stipulation the audio recording was a true and accurate recording of defendant's testimony at the bankruptcy proceeding. When the trial resumed on May 10, 2017, the trial court indicated it listened to the audio recording the night before. The record demonstrates the audio recording was provided during discovery, defendant was present during these discussions, and defendant had ample opportunity to revisit his sworn testimony, of which he had firsthand knowledge, to aid in his defense.

¶ 117　　　Given the record, we find defendant has not shown the denial of the right to be present resulted in an unfair trial or impeded another constitutional right, such as the right to aid in his defense or to choose not to testify on his own behalf. Defendant has not established he was denied a fair trial and thus, we find no clear error occurred.

¶ 118                        C. The Effect of the Bankruptcy Discharge

¶ 119        Defendant next argues his defense counsel was ineffective for failing to challenge

the restitution order. Defendant argues the bankruptcy discharge of the debts he owed to the

contractor-creditors prevented the trial court from ordering defendant to pay restitution to those

contractors for their losses. Defendant maintains the case lies at the intersection of bankruptcy

law and criminal-sentencing law and the discharge of his debts, the debts for which restitution

was ordered, barred the trial court from ordering restitution in this case. Thus, defense counsel

was ineffective for not challenging the restitution award.

¶ 120        The case law establishes a two-part test to determine whether a defendant was

denied the effective assistance of counsel. A defendant must prove (1) his or her counsel's

representation fell below an objective standard of reasonableness and (2) there exists a

reasonable probability the proceeding's outcome, absent counsel's error, would have been

different. *People v. Young*, 341 Ill. App. 3d 379, 383, 79 N.E.2d 468, 472 (2003). The burden of

proving ineffectiveness falls on defendant. See *Strickland v. Washington*, 466 U.S. 668, 687

(1984) ((holding "the defendant *must show* that counsel's performance was deficient" and "the

defendant *must show* that the deficient performance prejudiced the defense") (Emphases

added.)). The failure to prove either prong of this test precludes a finding counsel was

ineffective. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 37, 83 N.E.3d 671.

¶ 121        In this case, defendant has not met his burden of establishing the first prong of his

ineffective-assistance-of-counsel claim as he has not established the Bankruptcy Code's

discharge precludes this State's courts from imposing restitution orders during sentencing to

compensate victims for debts unlawfully obtained. To support his argument, defendant cites

multiple cases regarding the discharge provisions of the Bankruptcy Code, but he cites only two cases that have considered whether a trial court can order restitution following a conviction in a criminal proceeding for a debt discharged in bankruptcy. Defendant cites *United States v. Carson*, 669 F.2d 216 (5th Cir. 1982), and *United States v. Alexander*, 743 F.2d 472 (7th Cir. 1984). Neither supports defendant's claim.

¶ 122        In both *Carson* and *Alexander*, the courts found restitution orders could be made following a conviction in a criminal proceeding for debts discharged in bankruptcy. In *Carson*, the defendant secured a loan through false pretenses. *Carson*, 669 F.2d at 217. In 1979, that debt was discharged in bankruptcy, but in 1980 the defendant was convicted of making a false statement to secure that loan and then ordered, as a condition of probation, to provide restitution to the victim of his crime. *Id.* The court observed the defendant's claim the bankruptcy's discharge of the debt precluded the order of restitution "*might* have some appeal" if the primary goal "of the probation condition were to make the bank whole." (Emphasis added.) *Id.* The court found the probation condition of restitution served a rehabilitative purpose "by strengthening the individual's sense of responsibility." (Internal quotation marks omitted.) *Id.* at 218. The court further noted that " 'conditioning probation on making restitution also protects the community's interests in having the victims of crime made whole.' " *Id.* (quoting *Huggett v. State*, 266 N.W.2d 403, 407 (Wis. 1978)). The *Carson* court concluded the discharge of the defendant's debt to the victim did not foreclose the district court from conditioning probation on restitution. *Id.*

¶ 123        In *Alexander*, the defendant was ordered to pay restitution for a debt incurred under a scheme to defraud as a condition of his sentence of probation. *Alexander*, 743 F.2d at

473-74. The Seventh Circuit, while not "in full agreement" with the analysis in *Carson*, found its result "eminently correct." *Id.* at 480. The court concluded the following, finding no indication Congress intended to prevent judges from ordering restitution in sentencing:

> "The trial judge specifically noted 'that restitution is a critical element of the rehabilitation process that I think has to occur in this case.' Although imposition of a fine may have the same *pecuniary effect* as restitution on the probationer, the *rehabilitative effect* may well be augmented by the act of making one's victims whole. We discern nothing in the bankruptcy code that evinces a congressional intent to prevent sentencing judges from imposing such potentially rehabilitative probation conditions." (Emphases in original.) *Id.*

¶ 124    Thus, the only two cases relied upon by defendant show the Bankruptcy Code should not be read so broadly as to limit courts from imposing restitution.

¶ 125    Defendant argues, however, *Alexander* shows restitution is permissible only when the purpose of the restitution is rehabilitative. Defendant contends the trial court did not make a finding the restitution ordered in this case served that purpose and highlights language showing the court ordered restitution, despite questioning the State about the application of the Bankruptcy Code, to make the victims whole: "[O]ne of my goals in sentencing in a case such as this is to see that any contractors or other victims are made whole to the—to the extent that that's possible." Defendant argues this is an end-run around the bankruptcy judgment.

¶ 126    We disagree that *Alexander* should be read so narrowly. *Alexander* does not hold

restitution may be ordered only when the trial court specifies the purpose of the imposition of restitution is rehabilitative. Instead, the court's analysis, like that in *Carson* (see *Carson*, 669 F.2d at 218), shows restitution is by nature rehabilitative. The *Alexander* court pointed to the trial judge's language stating "restitution is a critical element of the rehabilitation process that I think has to occur in this case" and observed "the *rehabilitative effect* may well be augmented by the act of making one's victims whole." (Emphasis in original.) *Alexander*, 743 F.2d at 480. The court also found "nothing in the bankruptcy code that evinces a congressional intent to prevent sentencing judges from imposing such potentially rehabilitative probation conditions." *Id.* If restitution has a rehabilitative effect, then it follows a trial court's comment it seeks to make the victims whole does not negate that effect and the cases relied upon by defendant thus support a finding the Bankruptcy Code does not bar the order mandating restitution to the wronged contractors.

¶ 127    The authority relied upon by defendant permits the action which he argues is barred. Defendant has thus not shown the discharge barred the order of restitution and, therefore, cannot prove counsel provided ineffective assistance by not challenging the order in the trial court.

¶ 128                      D. Restitution for Debt to Phoenix Insulation

¶ 129    Defendant next asks this court to vacate the restitution order to Phoenix Insulation as he was acquitted of committing theft from Phoenix Insulation. Defendant acknowledges this error was not raised below but contends we may correct the error as plain error or by finding counsel's failure to raise the issue to be a denial of his right to the effective assistance of counsel.

¶ 130    The State urges this court to deny the relief defendant seeks, arguing defendant

invited the error to occur. The State contends defense counsel argued at sentencing restitution should be ordered to all contractors to avoid a prison sentence. The State, citing *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 79, 996 N.E.2d 1227, emphasizes "invited errors are not subject to plain-error review."

¶ 131     We are not convinced defendant invited this alleged error. The State made a similar argument in response to defendant's contention the restitution order was barred by the discharge of his debts under the Bankruptcy Code. As to that issue, the State maintained defendant should not have been permitted to agree to restitution, when the trial court showed concern about the effect of the bankruptcy discharge, in an attempt to avoid imprisonment and then be allowed on appeal to have the restitution order vacated. Had we not rejected defendant's claim due to his failure to show error, this argument would likely have carried weight in the analysis of that claim. See generally *In re Vik*, 45 B.R. 64, 69 (N.D. Iowa 1984) ("An individual on the one hand, should not be allowed to avoid incarceration by agreeing to make restitution and then on the other, seek to avoid a significant portion of his penal obligations merely by filing bankruptcy.").

¶ 132     As to this issue, however, the record does not show defendant invited the error of a criminal sentence of restitution on a count for which he was acquitted. Unlike the discharge/bankruptcy argument, there is no indication the trial court or the parties were aware a sentence of restitution was proposed or being imposed despite the absence of a crime against Phoenix Insulation. In addition, it is unlikely counsel decided to include the restitution for the debt to Phoenix Insulation, in the amount of $3322, in his attempt to avoid imprisonment when over $90,000 in restitution would be ordered. The general invitation to impose restitution as to

all contractors to avoid a prison sentence was not an invitation to impose restitution on offenses defendant did not commit.

¶ 133        Turning to defendant's argument, under the plain-error doctrine, sentencing errors are reviewable though raised for the first time on appeal if (1) the evidence is closely balanced or (2) the error is sufficiently grave it deprived defendant of a fair sentencing hearing. *People v. Williams*, 2018 IL App (4th) 150759, ¶ 16, 99 N.E.3d 590. Defendant carries the burden of establishing the doctrine applies. *Id.*

¶ 134        The first step in plain-error analysis is determining whether clear error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 410-11 (2007). Here, we find clear error occurred. " 'It is well established that a court may not impose restitution for charges upon which a defendant is acquitted.' " *People v. Clausell*, 385 Ill. App. 3d 1079, 1081, 904 N.E.2d 108, 110 (2008) (quoting *People v. Owens*, 323 Ill. App. 3d 222, 234, 753 N.E.2d 513, 523 (2001)). It was error for the trial court to order restitution to Phoenix Insulation when Phoenix Insulation was not the victim of a crime for which defendant was convicted.

¶ 135        We further agree with defendant the second prong of the plain-error doctrine applies. It is difficult to imagine a more serious threat to the fairness of a sentencing hearing than to allow the imposition of a criminal sentence when no conviction occurred. We therefore vacate the order of restitution to Phoenix Insulation.

¶ 136                              III. CONCLUSION

¶ 137        We reduce defendant's conviction on count VIII to misdemeanor theft, affirm defendant's other convictions, vacate the restitution order to Phoenix Insulation, and remand for resentencing on count VIII.

- 40 -

¶ 138     Affirmed as modified and vacated in part.

¶ 139     Cause remanded with directions.

¶ 140     JUSTICE STEIGMANN, specially concurring:

¶ 141     I completely agree with my distinguished colleagues in the majority regarding their analysis of a defendant's right to be present at all critical stages of trial. I specially concur only because the matter at issue in this case—namely, the trial judge's private listening to an audio recording of the bankruptcy proceedings—did not constitute a critical stage of trial. Indeed, the trial judge's doing so constituted no hearing at all.

¶ 142     A fundamental difference exists between this case, on the one hand, and *Lucas* and all the other cases defendant cites, on the other. That difference is that in the present case, the trial judge was considering evidence that had *already been admitted*, as opposed to all of the other cases in which the defendant was not present (for whatever reason) at a time the evidence was *presented*.

¶ 143     Especially given that this was a bench trial, a defendant has no right to be present when the trial judge considers and evaluates (as trier of fact) evidence that had already been admitted, such as the audio of the bankruptcy proceedings in this case. After all, under these circumstances, there is no possibility that defendant's presence or absence could in any way affect the trial judge's consideration of the admitted evidence.

¶ 144     Even in *Lucas*, the case defendant primarily relies upon, the First District correctly quotes the United States Supreme Court in *Kentucky v. Stincer*, 482 U.S. 730 (1987), that " 'a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.' "

(Emphasis omitted.) *Lucas*, 2019 IL App (1st) 160501, ¶ 12 (quoting *Stincer*, 482 U.S. at 745). The *Lucas* court then goes on to write that "[w]hether a defendant's absence affects the trial's fairness depends on an assessment of the whole record; analysis 'turn[s] on the nature of the hearing from which the defendant ha[s] been excluded.' " *Id.* ¶ 13 (quoting *People v. Lofton*, 194 Ill. 2d 40, 68, 740 N.E.2d 782, 798 (2000)).

¶ 145    Technically speaking, no "hearing" ever occurred in the present case from which defendant had been excluded; a trial judge's consideration of already admitted evidence does not constitute a "hearing." This is in addition to the earlier point that there is no chance that defendant's presence or absence could possibly affect the fairness of the procedure.

¶ 146    Perhaps another way of considering this point is to imagine a scenario (possibly it could have happened even in this case, given all of the evidence about how the proposed remodeling was supposed to have come about) in which the State offered 160 pages of documents pertaining to the proposed remodeling project. Assume in this scenario that the defendant in this bench trial did not bother to challenge the foundation of the documents (because doing so would have been fruitless) and stipulated that the judge as trier of fact could consider all of them in reaching his decision as to defendant's guilt. Assume further that the trial judge then decided to either (1) review the documents in chambers with his feet up while drinking a cup of coffee or (2) to take the matter under advisement, during which time the judge would review these documents at his leisure and then ultimately announce his decision.

¶ 147    Under the foregoing scenario, an argument that the defendant was denied his right to be present at a critical stage of the proceedings—namely, when the judge was considering this admitted evidence—would simply make no sense at all. Yet, that is essentially

what happened in this case.  After all, the audio recording of the bankruptcy proceedings had been admitted into evidence, and the parties even agreed the judge could consider the recording in chambers. Even absent this agreement to do so, the judge acted entirely appropriately by reviewing the audio recording in chambers.

¶ 148    And what sense does it make to claim that a defendant has a right to be present while the trial judge, sitting as trier of fact, reviews already admitted evidence? Going back to the scenario I just posed, could anyone really argue that a defendant had a constitutional right to be present at this so-called "critical stage of the trial" so defendant could watch the judge as he reviews these 160 documents on the bench?

¶ 149    Last, I believe that the First District decision in *Lucas* was wrongly decided. Although the proposed Rule 23 order does a good job of distinguishing it (see *supra* ¶ 116), I agree with Justice Lavin's dissent in *Lucas*.