2023 IL App (1st) 210352-U

No. 1-21-0352

Order filed September 22, 2023

FIFTH DIVISION

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 1065 |
| | ) | |
| ANGEL VILLA, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Mitchell and Justice Ellis concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial evidence was sufficient to convict defendant of aggravated criminal sexual abuse. However, we reverse and remand where the trial court violated defendant's right to be present at all critical stages by viewing the complainant's video statement only in chambers, as the record does not otherwise establish that defendant viewed the video before deciding whether to testify.

¶ 2   Following a bench trial, defendant Angel Villa was convicted of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2016)) and sentenced to 30 months' probation. On appeal, Mr. Villa contends that the trial evidence was insufficient to prove him guilty beyond a

reasonable doubt because the complainant's testimony was not credible. He also contends that the court deprived him of his right to be present at all critical stages of the proceedings against him when it viewed a recording of the complainant's victim-sensitive interview (VSI) outside his presence. For the reasons stated below, we reverse and remand.

¶ 3    Mr. Villa was charged with predatory criminal sexual assault and aggravated criminal sexual abuse of A.G. allegedly committed between June 1, 2016, and November 8, 2016, when Mr. Villa was at least 17 years old and A.G. was under 13 years old. The predatory criminal sexual assault counts alleged he touched her sex organ with his hand and inserted his finger into her sex organ while the aggravated criminal sexual abuse count alleged that defendant touched her buttock with his hand.

¶ 4    Prior to trial, the State filed a motion to admit evidence of statements made by A.G. pursuant to section 115-10 of the Code of Criminal Procedure (725 ILCS 5/115-10 (West 2016)). At the hearing on the motion, the court allowed statements by A.G. to her mother Isabel Sanchez and video of A.G.'s March 2017 VSI by Alison Alstott.[1] Ms. Alstott's hearing testimony and the parties' arguments described some of the video's contents.[2] The court stated that it would view the video in chambers and defense counsel raised no objection.

¶ 5    At the January 2020 trial, 10-year-old A.G. testified that she knew Mr. Villa as her maternal grandmother Aurora's boyfriend for about seven years and saw him at Aurora's home where she visited weekly. Mr. Villa touched her more than once, and the first time occurred in Aurora's living

---

[1] The record refers to but does not include the State's written motion.

[2] The record does not establish whether defendant was in court for the presentation of evidence during the section 115-10 hearing, but defendant does not claim that he was absent from the hearing nor contend that he was deprived of any rights by his absence.

room. A.G. could not recall what time of year that happened beyond that it was in the "[f]all and summer" before her seventh birthday.

¶ 6    In the first incident, A.G. went to Aurora's living room to watch television when Mr. Villa and A.G.'s cousin, Jacob, three or four years old at the time, were present. Mr. Villa asked A.G. to give him a hug, and she went to him. She was wearing pants and a shirt. However, instead of hugging her, Mr. Villa "[p]ut his hands between [her] legs" "[u]nderneath" her pants and underwear. He touched her "front butt and *** back butt," which A.G. explained to be where she urinated and defecated, respectively. He touched her "front butt" with his hand, moving it around in a front-to-back rubbing motion. He put his finger "inside the hole" of her "front butt" for "[s]econds," which felt "bad." A.G. ran to Aurora's bedroom, but nobody was there. There were other adults in the home, but A.G. did not tell them what Mr. Villa did "[b]ecause [she] was afraid what they would say." She also did not tell her parents when she went home.

¶ 7    Mr. Villa touched A.G. again the day after the first incident, again in Aurora's living room. She again went to the living room to watch television when she found Mr. Villa there alone. He asked her for another hug, and she went to him "[b]ecause [she] was afraid of what he would say if [she] didn't." She was again wearing pants and a shirt. He again touched her "front butt" under her clothes, rubbing it with his hand for "[s]econds." His hand was outside the hole of her "front butt." When he stopped, she left the room. A.G. did not tell Aurora, or her parents when she went home, "[b]ecause again I was afraid."

¶ 8    There was another incident in the summer before A.G.'s seventh birthday, when she and Jacob were playing basketball in Aurora's garage. Mr. Villa was with them, while others were out in the yard. At one point, Mr. Villa asked A.G. for a hug and "lifted [her] up" by her "butt and

waist." She was wearing a skirt, and he touched her "front butt" under her underwear with his finger, rubbing outside the hole for a "second." A.G. did not scream or say anything to Mr. Villa, but he stopped and put her down, and she went to her parents.

¶ 9 Mr. Villa touched A.G. again on the "fifth day," in the living room when only she and Mr. Villa were present and he again asked her to hug him. She was wearing a skirt and leggings. He again touched her "front butt" under her clothing, moving his finger around for "[a]bout a minute" inside the hole. She was not able to get away, but he stopped "on his own" and she ran away. Again, she did not tell Aurora or other adults in the home out of fear. However, she told her parents when she got home "later that night."

¶ 10 A.G. then clarified that she first told her mother later when they were seeing a doctor. After the doctor advised her that she was going to examine her butt and reminded her that "no one else can," A.G. told her mother that Mr. Villa "does that to me." A.G. could not recall her mother's response but did recall being brought to an interview. A.G. denied being told "exactly what to say" or that Mr. Villa "did something to" her.

¶ 11 On cross-examination, A.G. testified that, in addition to the incidents she described on direct examination, Mr. Villa touched her inappropriately at night "[n]ear the elevator" when other adults including her parents and Aurora were present. A.G. did not think that Jacob reported the incidents for which he was present. A.G. reiterated that she told her mother, not her father, "[a]t the doctor's" despite her direct testimony that she told her parents on the evening of one of the incidents. After the doctor's appointment, A.G.'s mother asked her for more details, which A.G. gave her at home. A.G. told her mother that there were three incidents and that she was wearing clothes each time. The three incidents occurred in the same week, and each occurred in Aurora's

living room when Mr. Villa asked her for a hug when he was seated and she was standing. Mr. Villa touched her "[u]nderneath" rather than "over the clothes," and he touched her "back butt" as well as her "front butt." However, when asked if he touched her "front butt" and "back butt" in all three incidents, A.G. replied "No."

¶ 12    The party at which Mr. Villa touched her in the garage was "a cookout" in the summertime, not Jacob's January birthday, despite telling Ms. Alstott that it was Jacob's fourth birthday. "I said that, but I didn't really mean that." When asked if that was a false memory, A.G. said, "Yes." A.G. did not tell her parents, Aurora, or any of the other adults in the yard what Mr. Villa did in the garage, but told her mother the next day at the doctor's office.

¶ 13    Regarding the incident where Mr. Villa touched her near the elevator while various adults, including her parents and Aurora were nearby, A.G. clarified that the elevator was an outdoor open platform lift for accessibility, next to a short eight-step staircase, and some of the adults were on the stairs during the incident. Mr. Villa asked her to hug him and then touched her "front butt" under her clothes, rubbing inside the hole for "[s]econds." She could not recall what she was wearing. On recross examination, A.G. could not recall when the elevator incident occurred beyond that it was summer.

¶ 14    A.G. remembered visiting a female doctor after Ms. Alstott interviewed her, but she did not recall her name or what she discussed with her. She did not remember indicating that she was touched on her chest, vagina, and buttocks, and she denied saying that there were five or six incidents. A.G. acknowledged telling Ms. Alstott that Mr. Villa did not touch her chest, and she testified that he did not touch her chest. A.G. also acknowledged telling Ms. Alstott about her friend Victoria telling her that someone touched Victoria's butt, and that A.G. first told her mother

that Mr. Villa touched her butt. A.G. recalled telling Ms. Alstott that her grandfather Ramone had a new girlfriend but still liked Aurora, but did not recall telling her that Ramone visited both women.

¶ 15   On redirect examination, A.G. testified that she told her mother what Mr. Villa had done because the doctor reminded her that only the doctor and A.G. herself "were supposed to do that." When she told her mother at home what Mr. Villa had done, she showed her how he had touched her by demonstrating on a stuffed animal toy. Because it concerned her "private parts," she had not felt comfortable telling any adult but her mother and the doctor. While A.G liked Ramone, she denied fabricating her allegations against Mr. Villa "for [her] Grandfather Ramone."

¶ 16   Ms. Sanchez, A.G.'s mother, testified that in 2016 Mr. Villa was dating her mother, Aurora, and Ms. Sanchez would take A.G. to Aurora's home for visits three or four times a week. On November 8, 2016, Ms. Sanchez took A.G. to a medical appointment because she was complaining of chest pain. A doctor examined A.G., after first telling her that (as Ms. Sanchez put it) "I'm about to check you and possibly touch you in places just to make sure that everything is okay, but that's fine for me to do because I'm the doctor and your mom is here, but no one else should be touching or looking at you in these places." When the doctor was out of the room, Ms. Sanchez reiterated her admonishment to A.G., who said, "You know who kind of does that to me?" Ms. Sanchez asked her who, and A.G. replied that "Angel" did. Mr. Villa was the only family member or friend known as Angel.

¶ 17   Ms. Sanchez asked A.G. what she meant, and she replied that "he touches my butt when he hugs me." Surmising that Mr. Villa might touch her buttocks inadvertently due to their height difference, Ms. Sanchez hugged A.G., putting her hands on her lower torso or tailbone, and asked

if that was how Mr. Villa did it, but A.G. said it was not like that. Ms. Sanchez asked A.G. to demonstrate how Mr. Villa hugged her, but "her demeanor changed" to being visibly uncomfortable and she said, "I don't want to do that to you." Noting this reaction, Ms. Sanchez did not press the matter but told A.G. she would need to explain later.

¶ 18    Two days later, they were home in the evening when A.G. approached Ms. Sanchez and asked if she still wanted to know what Mr. Villa had done to her. Ms. Sanchez said that she did, and A.G. demonstrated on a stuffed animal toy. A.G. put her right hand between the animal's hind legs in "the crotch area." Ms. Sanchez did not understand and asked A.G. "Do it to me," but "again she got kind of weird" and her "demeanor changed like I don't want to do it to you." Ms. Sanchez told her that she needed to understand, and A.G. embraced her, pulling Sanchez towards her while putting her hand between Ms. Sanchez's legs. Ms. Sanchez asked A.G. where this happened, and she replied that it happened at Aurora's home. Ms. Sanchez did not call the police or tell anyone else what A.G. reported because she "was struggling with *** just comprehending taking it all in" and worried about making the incidents "a big highlight of [A.G.'s] life."

¶ 19    Ms. Sanchez reported the incidents to police in late February 2017, accompanied by her father, Ramone. She told Ramone because "this was something that was eating away at me for months." She had already told her sister and Aurora, who "tucked it away [as] a secret." In March 2017, Ms. Sanchez took A.G. to the Chicago Children's Advocacy Center (the Center) for a VSI, after advising A.G. that she would "have to tell her story one more time." Ms. Sanchez did not tell her what to say except to "tell exactly what she told me."

¶ 20    On cross-examination, Ms. Sanchez testified that there were various family barbecues at Aurora's home during the summer of 2016, and Mr. Villa attended some. Ms. Sanchez had not

seen the video of A.G.'s VSI but A.G. had told Ms. Sanchez that Mr. Villa touched her at a party or barbecue. The barbecues had 8 to 10 people in attendance, only a few feet from the open garage door. Cold drinks were stored in the garage, and people would go in to get more drinks.

¶ 21 A.G. also told Ms. Sanchez that Mr. Villa touched her near the elevator while Ms. Sanchez and others were nearby. Ms. Sanchez could not recall if A.G. told her that before or after she went to the police. A.G. revealed more details as she felt comfortable, and Ms. Sanchez encouraged her to do so.

¶ 22 Ms. Sanchez did not believe A.G. was in danger before she told her about Mr. Villa on November 8, 2016, and she believed afterwards that A.G. was "[p]otentially" in danger from Mr. Villa touching her inappropriately. A.G. stopped going to Aurora's home without Ms. Sanchez also being present, and A.G. did not see Mr. Villa after that day. In November 2016, shortly after A.G. told her what Mr. Villa had done, Ms. Sanchez warned her sister and Aurora because her sister had children. However, Mr. Villa continued going to Aurora's home. A.G. seemed relieved when she described to Ms. Sanchez what Mr. Villa had done. Ms. Sanchez paid "really close attention to" A.G. after her report but she did not seem to be "suffering" from what Mr. Villa did.

¶ 23 Ms. Sanchez went to the police because Ramone told her to do so as soon as she told him what A.G. had reported. Ms. Sanchez denied telling a detective that she was unsure of A.G.'s allegations, testifying that she "never doubted her." Ms. Sanchez was reluctant to report the matter, not because she did not believe A.G., but because "she was so young. I didn't want to put her through this." Ms. Sanchez did not recall telling a detective that Mr. Villa touched A.G. on three occasions in the crotch area while A.G. was clothed. Ms. Sanchez recalled being interviewed by

Dr. Annie Torres in April 2017. She did not recall telling Dr. Torres that Mr. Villa touched A.G.'s chest with one hand as he put his other hand down her pants.

¶ 24     Ms. Alstott, a supervisor and interviewer at the Center in 2017, testified to conducting a VSI of A.G. on March 7, 2017, when A.G. was seven years old. Ms. Alstott had first met with the relevant investigators from the police and State's Attorney's Office, so that she would be aware of the "basic allegations" and any particular issues with the child being interviewed. The interview, which lasted about 40 minutes including breaks, was videorecorded, and investigators could watch through a one-way mirror. Ms. Alstott told A.G. that she should say when she did not understand a question, answer that she did not know rather than guessing at an answer, and should correct any misstatements by Ms. Alstott. Ms. Alstott also discussed with A.G. the difference between truth and lies and admonished her to tell only the truth.

¶ 25     Ms. Alstott had viewed video of the interview before trial, and she identified a certain disk as containing the video accurately depicting A.G.'s interview. The disk was admitted into evidence without objection, though defense counsel added that the admission was "[s]ubject to the Court's prior ruling" and the court agreed. The State asked the court if it wanted to view the video in open court or in chambers, and court said it would "review the video in chambers." The defense did not object to either the State's question or the court's decision.

¶ 26     On cross-examination, Ms. Alstott testified that she could not recall A.G. mentioning a location for the incidents with Mr. Villa other than Aurora's living room and garage. In particular, she did not recall A.G. mentioning an incident near an elevator in front of Aurora's home. In describing the garage incident, A.G. said it happened during a party for Jacob's fourth birthday. When Ms. Alstott and A.G. discussed particular parts of her body, A.G. pointed to her chest and

mentioned her "boobs." However, when Ms. Alstott asked her if anyone touched her boobs, she denied that anyone had done so. Near the end of the interview, Ms. Alstott met with the investigators during a break and then returned to ask A.G. how the incidents had occurred if she was wearing clothing. A.G. had responded that the incidents happened the same way every time. When Ms. Alstott rephrased the question, A.G. gave "pretty much the same answer."

¶ 27    When asked if anyone had discussed the interview with her beforehand, A.G. told Ms. Alstott that she and her mother "practiced talking." Ms. Alstott and A.G. had discussed A.G.'s family at the beginning of the interview to build rapport. Ms. Alstott asked A.G. how she got along with her grandfather Ramone, and she replied that he "yells sometimes." When Ms. Alstott asked at the end of the interview if anyone had ever told A.G. about inappropriate touching, she answered that her friend Victoria had mentioned that a "friend kind of touched her butt sometimes." A.G. also mentioned that Ramone liked and visited "both grandmas."

¶ 28    People's Exhibit 1, admitted into evidence but not viewed in court as stated above, was a video recording of Ms. Alstott's VSI of A.G. on March 7, 2017. The video is contained in the record on appeal and was viewed by this court. In the video, after Ms. Alstott explained that A.G. was not in trouble, A.G. answered some questions about her life, including stating that her grandfather Ramone would sometimes yell. Ms. Alstott reminded A.G. that she should correct errors and say when she does not know. A.G. explained the difference between the truth and a lie and promised to tell the truth. A.G. stated that she was there because "Angel *** touched her private part." He "just does that sometimes" and calls it a hug, but she did not call it a hug. A.G. met him at Aurora's house.

¶ 29 A.G. told Ms. Alstott that this happened for the first time when she was seven, in the living room of Aurora's home when the only other person present was A.G.'s three-year-old cousin Jacob. Mr. Villa was on the couch and A.G. was standing when he asked her for a hug. Though she said no, he touched her "front butt" and "back butt" with his hand, which she did not like. She explained that she uses her "front butt" for "peeing" and her "back butt" to "poop." Mr. Villa touched the cheek and inside the "line" of her "front butt," and both inside and outside the "line" of her "back butt," but did not touch inside the hole of either. Mr. Villa touched her skin while her clothes were on. When asked how he touched her skin if she was dressed, A.G. moved her cupped hand from side to side. Mr. Villa always touched her in the same way. During the incident, Mr. Villa did not make any sounds, breathe heavily, smile, or say anything. After the incident, A.G. went to Aurora's room and closed the door, and Mr. Villa did not follow.

¶ 30 A.G. said that it happened another time during a party for Jacob's fourth birthday, while A.G. and Jacob were playing in the garage of Aurora's home. The party was outside in the yard and only A.G., Mr. Villa, and Jacob were in the garage. A.G. told Mr. Villa to stop but he would not, and she could not get away that time. It felt "weird." During the incident, Mr. Villa was standing up and he picked up A.G. by the waist. She asked him to put her down, but he did not. A.G. unsuccessfully tried to bite Mr. Villa. Jacob saw what Mr. Villa was doing but did not say anything.

¶ 31 A.G. told Ms. Alstott that Mr. Villa touched her like that four or five times, always at Aurora's home. One time he did it while she was wearing a dress, going under her dress and touching her skin. Mr. Villa touched her inside the hole of her "front butt" only once and it "felt disgusting." A.G. no longer visited Aurora's home, as her mother tried to keep her safe and away

from Mr. Villa. Her mother was the first person she told. It took a while for A.G. to tell her mother because A.G. was not sure if she wanted her to know.

¶ 32   When Ms. Alstott asked A.G. twice how Mr. Villa touched her skin if she was wearing clothes, she answered both times that he touched her the same way. When asked again about the living room, A.G. said she was wearing a dress and leggings, and Mr. Villa went under the dress and touched under the leggings; A.G. moved her cupped hand back and forth to demonstrate. The next day, when A.G. was wearing pants and underwear, Mr. Villa put his hand in her pants but over her underwear. A.G. reiterated that Mr. Villa would do the same thing every time.

¶ 33   A.G. told Ms. Alstott that nobody touched her "boobs" and nobody but Mr. Villa touched her "front butt" or "back butt." When asked if she had ever seen Mr. Villa do anything similar to anyone else, A.G. described seeing Aurora and Mr. Villa together. A.G. also said that, when she was six or seven, her school friend Victoria told her about a girl who touched Victoria's butt and a boy who tried to kiss her. A.G. practiced talking with her mother before the interview, with her mother asking her questions about what Mr. Villa did.

¶ 34   The parties entered into two stipulations at behest of the defense. If called, police officer Juliana Parker would testify to taking Ms. Sanchez's report on February 24, 2017. Ms. Sanchez reported that Mr. Villa touched A.G. on three occasions in the crotch area while she was clothed. If called, Dr. Torres of the Center would testify to interviewing A.G. and Ms. Sanchez in April 2017 for a medical examination. Ms. Sanchez told Dr. Torres that A.G. told her that Mr. Villa put one hand on her chest and his other hand down her pants. A.G. pointed out to Dr. Torres that Mr. Villa touched her chest, vagina, and buttocks and said it happened five or six times.

¶ 35    The defense rested, Mr. Villa chose not to testify, and the parties presented closing arguments. After stating that it observed the witnesses and "paid particular attention" to A.G. both in court and in her VSI, the court found Mr. Villa guilty of aggravated criminal sexual abuse and not guilty of predatory criminal sexual assault. The court found that A.G. testified credibly "to the extent possible given her age and lack of experience" and "testified consistently *** that the defendant *** touched her buttocks." However, her testimony regarding predatory criminal sexual assault was "inconsistent" and "unclear," as there was evidence she had clothes on "and the contact was over her clothes," but also testimony that Mr. Villa put "his finger insider her sex organ."

¶ 36    Mr. Villa's amended posttrial motion challenged the sufficiency of the evidence, the admission of hearsay evidence of A.G.'s prior statements under section 115-10, and the court's sustaining of State objections and overruling of defense objections. The motion noted that the VSI was admitted over defense objection and the court viewed the interview in chambers during trial, but did not claim or argue that viewing the video in chambers was erroneous. Following a hearing where defense counsel argued the insufficiency of the trial evidence, the court denied the motion, finding that the State proved its case on aggravated criminal sexual abuse "after viewing the evidence observing [A.G.'s] demeanor," as she "consistently testified that the defendant grabbed her butt whenever he hugged her or whenever he asked her for a hug."

¶ 37    Following a sentencing hearing, the court sentenced Mr. Villa to 30 months of sex offender probation. Mr. Villa filed a timely notice of appeal. We find that we have jurisdiction to consider the merits of the appeal pursuant to Illinois Supreme Court Rule 606 (eff. Mar. 12, 2021).

¶ 38    On appeal, Mr. Villa first contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt of aggravated criminal sexual abuse because A.G. was not credible.

¶ 39    When the sufficiency of trial evidence is at issue, we must determine whether, taking the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Cline*, 2022 IL 126383, ¶ 25. All reasonable inferences from the evidence must be made in the State's favor. *Id.*

¶ 40    It is the responsibility of the trier of fact to weigh the evidence, resolve conflicts, and draw reasonable inferences; we do not substitute our judgment for that of the trier of fact or retry the defendant. *Id.* ¶¶ 33, 39. The trier of fact assesses witness credibility and, having observed the witnesses testifying, is better positioned than this court to do so. *People v. Jackson*, 2020 IL 124112, ¶¶ 66, 69. The positive and credible testimony of a single witness is sufficient to sustain a conviction even if the defendant contradicts it. *People v. Sauls*, 2022 IL 127732, ¶ 52. A witness's credibility is not necessarily destroyed by contradictions, as "it is the task of the trier of fact to determine when, if at all, [a witness] testified truthfully" and to decide how flaws in aspects of the testimony affect the credibility of the whole. *People v. Gray*, 2017 IL 120958, ¶ 47.

¶ 41    A trier of fact is not required to disregard inferences that flow normally from the evidence or to seek all possible explanations consistent with innocence and elevate them to reasonable doubt. *Cline*, 2022 IL 126383, ¶ 41. If the evidence as a whole satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt, it need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. *Jackson*, 2020 IL 124112, ¶ 70. A conviction will be reversed only if the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *Cline*, 2022 IL 126383, ¶ 25.

¶ 42    Here, to sustain Mr. Villa's conviction for aggravated criminal sexual abuse, the State was required to prove that he, when he was at least 17 years old, committed an act of sexual conduct,

a "knowing touching or fondling *** either directly or through clothing," with a victim under 13 years old "for the purpose of sexual gratification or arousal of the victim or the accused." 720 ILCS 5/11-0.1, 11-1.60(c)(1)(i) (West 2016). Mental states such as intent may be, and often are, inferred from the defendant's actions and the circumstances. *People v. Peterson*, 2017 IL 120331, ¶ 43; *People v. Taylor*, 2022 IL App (4th) 210507, ¶ 22.

¶ 43    In this court, Mr. Villa does not challenge any particular element of the offense but contends that his conviction should be reversed because A.G.'s credibility is questionable.

¶ 44    After reviewing the evidence in the light most favorable to the State, we find it sufficient to sustain Mr. Villa's conviction for aggravated criminal sexual abuse. Mr. Villa's argument essentially asks this court to substitute our judgment for that of the trier of fact on matters of witness credibility. This we cannot do. *Jackson*, 2020 IL 124112, ¶¶ 66, 69. As mentioned, the trial court found that A.G. testified credibly "to the extent possible given her age and lack of experience." In other words, the court weighed her trial testimony and VSI, including their discrepancies, in light of factors such as her age and the time that passed since the incidents.

¶ 45    As our supreme court has stated, a trier of fact "reasonably could have considered that [a victim] either forgot or was mistaken about some of the details because she was seven years old at the time of the incident and testified at trial nearly two years later." *Sauls*, 2022 IL 127732, ¶ 57. That is even more applicable here, where A.G. testified over three years after the incidents she described. A.G. stated consistently in her video interview and testimony that "Angel," *i.e.*, Mr. Villa, had touched her "back butt," which she clarified to be her buttocks. A reasonable trier of fact could conclude that Mr. Villa touched A.G.'s buttocks, when she was under the age of 13,

either directly or through clothing, for the purpose of his sexual gratification; that is, that Mr. Villa committed aggravated criminal sexual abuse as charged.

¶ 46    The trial court was not obligated to raise the discrepancies in A.G.'s testimony to reasonable doubt. The court's decision to find Mr. Villa not guilty of predatory criminal sexual assault can reasonably be attributed to finding A.G.'s accounts credible as a whole but ambiguous in parts. In other words, a rational trier of fact could conclude, as the court here did, that A.G. was telling the truth but expressing some aspects of that truth less than clearly in light of "her age and lack of experience." The court was also not obligated to interpret or weigh A.G.'s statements that Mr. Villa did the same things in each incident strictly or inflexibly. While the focus of A.G.'s accounts was on her "front butt" and she testified that Mr. Villa did not touch both her "front" and "back butt" in every incident, the court need have found only that Mr. Villa touched her buttocks at least once to find him guilty of aggravated criminal sexual abuse. Lastly, the court was not obligated to find reasonable doubt based on the discrepancy between A.G.'s testimony and video statement that Mr. Villa did not touch her chest or breasts and the stipulation that she said otherwise.

¶ 47    In conclusion, we find the evidence that Mr. Villa committed aggravated criminal sexual abuse of A.G. was not so unreasonable, improbable, or unsatisfactory that reasonable doubt of his guilt remains. *Cline*, 2022 IL 126383, ¶ 25.

¶ 48    Mr. Villa also contends that the court erred by viewing the video of A.G.'s VSI outside open court and his presence. He contends that the court violated his right to (1) be present at critical stages of the proceedings by viewing the video outside his presence without obtaining his knowing

and intelligent waiver of his right to be present, and (2) a public trial by viewing the video outside of open court.

¶ 49    As a threshold matter, Mr. Villa acknowledges he did not object to the court viewing A.G.'s VSI video outside his presence, either during the section 115-10 hearing or at trial. He also did not claim in his posttrial motion that this constituted error. A claim not raised by objection and preserved in a posttrial motion is forfeited. *People v. Mudd*, 2022 IL 126830, ¶ 21.

¶ 50    Mr. Villa asks this court to review this error as second-prong plain error. This court will consider a forfeited error if it is plain error; that is, if a clear or obvious error occurred and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice, or (2) the error was so serious that it alone affected the fairness of the proceedings. *Id.* ¶¶ 21-22. In considering a claim of plain error, we must first determine whether error occurred. *Id.* ¶ 22.

¶ 51    Section 115-10 of the Code of Criminal Procedure provides that, in prosecutions "for a physical or sexual act perpetrated upon or against a child under the age of 13" for various offenses including the offenses charged herein, the court may admit into evidence as an exception to the hearsay rule "testimony by the victim of an out of court statement made by the victim that he or she complained of such act to another," or "describing any complaint of such act or matter or detail pertaining to any act which is an element of" that offense or offenses. 725 ILCS 5/115-10(a) (West 2016). The evidence is admissible only if the child testifies at trial, or is unavailable to testify, and the alleged act is corroborated, and the "court finds in a hearing conducted outside the presence of the jury that the time, content, and circumstances of the statement provide sufficient safeguards of reliability." *Id.* § 115-10(b).

¶ 52    A criminal defendant has the right to be personally present at critical stages of the proceedings against him or her if his or her presence would contribute to the fairness of the procedure. *People v. Lofton*, 194 Ill. 2d 40, 67 (2000). A defendant has the right to be present whenever his or her presence bears a reasonably substantial relationship to having a full opportunity to defend against the charges, even where the defendant is not actually confronting witnesses or evidence against him. *Id.* at 66. Where the right to be present exists, a defendant must waive that right knowingly and voluntarily. *Id.* at 73.

¶ 53    Conversely, the right to be present is not absolute, and a defendant's absence from even a critical stage of the proceedings will not constitute plain error unless it caused the proceeding to be unfair or resulted in a denial of an underlying substantial right such as the right to confront witnesses, present a defense, or be tried by an impartial jury. *People v. Brown*, 2023 IL 126852, ¶ 15; *People v. Lindsey*, 201 Ill. 2d 45, 57 (2002). A defendant cannot rely on broad principles not applicable to the specifics of his or her case but must establish in light of the entire record that the fairness of his or her proceedings was affected by his or her absence. *Lindsey*, 201 Ill. 2d at 57-58.

¶ 54    In *Lofton*, where the defendant was not present for the section 115-10 hearing (*id.* at 71), our supreme court stated:

> "In light of the entire record, we cannot say that there is nothing defendant could have done had he been present at the section 115-10 hearing and nothing he could have gained [citation]. Numerous details, possibly disadvantageous to the State's position, about precisely how [the child] came to accuse the defendant were elicited at trial at which defendant was present, whereas virtually none were elicited at the section 115-10 hearing the day before from which he had been absent. *** The record suggests that defendant's

presence at the section 115-10 hearing would have contributed to his ability to defend himself against the charges." *Id*. at 71-72.

The *Lofton* court therefore found that,

"Because the record indicates that defendant's presence at the section 115-10 hearing would have contributed to the fairness of the criminal proceeding against him and that a fair and just hearing was thwarted by his absence, we conclude that the section 115-10 hearing was a stage critical to the outcome of the criminal proceeding at which defendant had a right to be present." *Id*. at 72-73.

¶ 55    In *People v. Lucas*, 2019 IL App (1st) 160501, ¶¶ 4-7, where a defendant was convicted in relevant part of driving under the influence, the trial court viewed video of her traffic stop in chambers with counsel but not the defendant present, and stated that it relied at least in part on the video in finding the defendant guilty. This court found second-prong plain error (*id.* ¶ 21), finding that the defendant's "absence from the video viewing affected the trial's fairness because she was unable to view the evidence against her and aid in her own defense." *Id*. ¶ 14. "The presentation of evidence at trial is undoubtedly a critical stage of the proceeding, and here, the video of the traffic stop involved a significant portion of the evidence against" the defendant. *Id*. ¶ 15. Not only did the defendant not see the video during trial, "no evidence, let alone affirmative evidence, indicates that she viewed the video before trial." *Id*. ¶ 16. The defendant needed to know what was on the video, not just that it existed, to decide whether to testify. *Id*. ¶¶ 19-20. While "counsel could provide a summary of the contents of the video," for purposes of the defendant's "decision to testify or not, counsel's gloss on the evidence is no substitute for her own knowledge." *Id*. ¶ 20.

¶ 56 In *People v. Groebe*, 2019 IL App (1st) 180503, ¶ 31, a defendant convicted of aggravated driving under the influence similarly contended that "her right to a public trial was violated when the trial court viewed the video recording of the traffic stop and field sobriety tests in chambers during a break in the trial." Counsel had not objected to the court doing so. *Id.* ¶ 19. Acknowledging that counsel cannot waive a defendant's right to be present, the *Groebe* court addressed the defendant's right to be present and found that she did not establish that her absence from the video viewing caused the proceedings to be unfair or deprived her of an underlying substantial right. *Id.* ¶¶ 50-52. Unlike *Lucas*, the *Groebe* "defendant has pointed to no statements by the trial court, referencing what was depicted in the video as forming an independent basis for its judgment," and factors other than the video were determinative in the court's decision, so that there was nothing to "suggest the trial court's procedure prejudiced defendant's ability to aid in her defense or to decide whether to testify." *Id.* ¶ 52.

¶ 57 In *People v. Richardson*, 2021 IL App (1st) 190821, ¶ 53, the "defendant was present in court for the section 115-10 hearing, including the testimony of multiple live witnesses." The trial court viewed video of the interviews of the child for purposes of section 115-10 in chambers, but those videos were played at trial in the defendant's presence. *Id.* This court found that the "defendant was able to view all of the State's evidence against him at trial, and his decision regarding his right to testify was not impacted." The *Richardson* court distinguished *Lofton*, where:

> "the defendant was not present for any portion of the section 115-10 hearing, and the supreme court was not asked to consider the issue before us now. Significantly, in reaching its conclusion, the supreme court specifically made its ruling based on the record of that case. Thus, each case should be considered on its own record. In contrast with

*Lofton*, nothing in the record suggests that defendant's presence while the trial court reviewed the recorded interviews would have impacted his ability to defend himself." *Id.* ¶ 54.

¶ 58 Similarly, this court has considered various cases where a defendant claimed that the right to be present at critical stages and the right to a public trial were violated by the defendant's absence as the trial court viewed videos of VSIs; we considered these cases under plain error as the claims were not preserved by objection. *People v. Rodriguez*, 2022 IL App (1st) 200315, ¶¶ 98-110; *People v. Martinez*, 2021 IL App (1st) 172097, ¶¶ 60-69; *People v. Myles*, 2020 IL App (4th) 180652, ¶¶ 56-65. In these cases, we found no error because the record affirmatively established that the defendants had seen the videos, and thus were aware of all the State's evidence when the decision came whether to testify.

¶ 59 Mr. Villa cites *People v. Flagg*, 2021 IL App (1st) 191692-U, as persuasive authority. See Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023). In *Flagg*, the defendant contended that the court violated his right to be present when it viewed video of a VSI in chambers during trial, while the State responded that the defendant forfeited the claim and that viewing the video was not a critical stage of the proceedings. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 44. "The record shows that the trial court did not view the video during the section 115-10 hearing, where defendant was present, and then viewed the video in chambers at trial." *Id.* ¶ 49. This court found that the record did not establish that the defendant saw the video outside of court, where his pretrial statement that his attorneys "sped through" a video did not specify which video, the defense's requests to bring a laptop into prison to review video evidence did not establish that the visits actually occurred, and the provision of a summary of the VSI to the defense did not establish that the defendant read it.

*Id.* "Based on these facts, we find that the court erred by viewing the VSI video in chambers rather than playing it in open court in defendant's presence, and this error constituted second-prong plain error because it denied defendant his constitutional right to be present at all critical stages of proceedings." *Id.* ¶ 51.

¶ 60    The *Flagg* court rejected the State's argument that in-chambers viewing of the video was not a critical stage because the other evidence of the defendant's guilt was strong, stating that "the strength of the other evidence does not impact our analysis here" and is not part of the analysis of a second-prong plain error claim. *Id.* ¶ 55. The *Flagg* court also distinguished *Groebe*, where "we emphasized that there was no indication the trial court gave the video any weight in making its findings," while in *Flagg* "the court considered the video in its credibility determinations and guilty finding." *Id.* ¶ 53.

¶ 61    The Fourth District of this court rejected the logic of *Flagg* in *People v. Aquisto*, 2022 IL App (4th) 200081, ¶ 72, where a defendant contended "that by viewing outside his presence *** the postarrest video of his interrogation, the circuit court violated his due-process right to a public trial." The contention was considered under plain error because counsel did not object to the court viewing the video in chambers. *Id.* The *Aquisto* court distinguished *Lucas* on the basis that "the circuit court viewed the video *before* admitting the video in evidence" in *Lucas* while in the case before it, "it appears that the circuit court viewed the video *after* admitting the video in evidence." (Emphases in original.) *Id.* ¶ 73. In *Flagg*, by contrast, the court viewed the video at issue after it was admitted into evidence. *Id.* ¶ 74.

¶ 62    Considering *Flagg*, the *Aquisto* court cited favorably its earlier unpublished decisions that the trial court's consideration of already-admitted evidence is not itself a proceeding. *Id.* ¶ 81

(citing *People v. Maniwa*, 2021 IL App (4th) 190796-U, and *People v. Duckworth*, 2021 IL App (4th) 180740-U). An "admitted video was comparable to admitted documentary evidence and \*\*\* the defendant's presence in chambers as the judge reviewed an admitted video would not have contributed to the defendant's ability to mount a defense any more than if the defendant were present in chambers as the judge reviewed documentary evidence." *Id.* Acknowledging the reasoning in *Flagg* that "the defendant could have made a better-informed decision of whether to take the stand and testify on his own behalf" (*id.* ¶ 82) had he seen the video, the *Aquisto* court found that *Flagg* leads to "an implausible conclusion: a judge would be forbidden to read, in the privacy of chambers, a document admitted in evidence unless the record affirmatively disclosed that the defendant personally had read the document first." *Id.* ¶ 83.

¶ 63    The *Aquisto* court also briefly addressed the right to be present, finding that the "defendant offers no convincing explanation of how his presence in chambers during the viewing of the postarrest video would have contributed to the fairness of the procedure." *Id.* ¶ 84. The video was disclosed in discovery, "[a]s far as we know, nothing prevented defendant from watching the video himself," and "[s]ince the video was of defendant's being interviewed by the police, he must have known what was in the video." *Id.*

¶ 64    After carefully reviewing the record and applying the aforementioned principles to the specifics of Mr. Villa's case, we find second-prong plain error; that is the fairness of Mr. Villa's trial was affected by his absence from the court's viewing of the VSI video. Here, the VSI video was admitted into evidence at trial and then viewed by the court in chambers rather than in open court or otherwise in Mr. Villa's presence. Unlike *Myles*, *Martinez*, and *Rodriguez*, the record does not establish that Mr. Villa saw the video outside of court. Unlike *Groebe*, where we found no

indication that the trial court gave the video any weight, we cannot say that the VSI video was not a significant factor in Mr. Villa's conviction. In announcing its ruling, the trial court stated that it "paid particular attention to" A.G.'s account in both her testimony and VSI in finding her generally credible and finding Mr. Villa guilty of aggravated criminal sexual abuse.

¶ 65     *Flagg* and *Aquisto* are the most directly conflicting cases as they affect our decision here, but we find the analysis in *Flagg* is applicable here where the circumstances more closely mirror the facts of that case. *Flagg* and the instant case are substantially distinguishable from *Aquisto* and the unpublished cases it relies upon. In *Flagg* and here, the VSI videos affected the outcome of the trial and the defendants had no independent or personal knowledge of their contents. *Flagg*, 2021 IL App (1st) 191692-U, ¶ 53. In *Aquisto* "the video was of defendant being interviewed by the police," so that "he must have known what was in the video." *Aquisto*, 2022 IL App (4th) 200081, ¶ 84. Similarly, the recording in *Duckworth* was of the defendant's own testimony in another proceeding, "of which he had firsthand knowledge." *Duckworth*, 2021 IL App (4th) 180740-U, ¶ 116. Thus, the instant case where Mr. Villa had no knowledge of the content of the VSI video unless he viewed it is similar to *Flagg* and distinguishable from *Aquisto* and *Duckworth* where the defendants had independent knowledge of their videos' contents.

¶ 66     The State's brief and the *Aquisto* decision cite *Maniwa* for the proposition, derived from a concurrence in *Duckworth*, that the viewing of evidence after its admission is not a proceeding and being present during the court's viewing of evidence would not have contributed to the defense. *Maniwa*, 2021 IL App (4th) 190796-U, ¶ 31 (citing *Duckworth,* 2021 IL App (4th) 180740-U, ¶¶ 145-146 (Steigmann, J., concurring)). In this vein, the *Aquisto* court opined that *Flagg* leads to "an implausible conclusion: a judge would be forbidden to read, in the privacy of chambers, a

document admitted in evidence unless the record affirmatively disclosed that the defendant personally had read the document first." *Aquisto*, 2022 IL App (4th) 200081, ¶ 83. We respectfully disagree. The trier of fact, whether court or jury, can review documentary evidence, or indeed any other evidence, during deliberations. Concern arises when the trier of fact *only* views or listens to evidence in private so that it is not seen or heard in open court by the defendant. Publishing evidence such as video and audio recordings in open court at trial serves the purpose of ensuring that the defendant has seen and heard all the evidence so that he or she may contribute to the defense and make an informed decision whether to testify.

¶ 67      That purpose can also be served by eliciting on the record that the defendant has seen or listened to a particular piece of evidence before admitting it if the court intends to review it only in private, if that information has not already been spread of record in the course of proceedings. Even where the court does not elicit that information before admitting or privately reviewing the evidence, the court may avoid error by doing so before the defendant decides whether to testify and the defense rests. For instance, in *Martinez*, "at the conclusion of the first day of trial, *** the court ensured that defendant would have the opportunity to view the VSI before the second day of trial resumed" by instructing that the defendant view the VSI video in counsel's presence, followed by counsel stating in open court that it was done. *Martinez*, 2021 IL App (1st) 172097, ¶¶ 63-64, 69. *Flagg* does not create an onerous or implausible requirement.

¶ 68      Having found *Flagg* most persuasive, we must conclude that Mr. Villa was deprived of his right to be present at critical stages of the proceedings by his inability to view all the evidence against him before deciding whether to testify. With the video not having been shown in court in Mr. Villa's presence, and the record not otherwise showing that Mr. Villa saw the video or had

firsthand knowledge of its contents, we cannot find that Mr. Villa saw and heard all the evidence at issue before he decided whether to testify. Indeed, unlike *Flagg* where there was some evidence concerning the defendant viewing the VSI video, albeit ambiguous and indecisive, the record here truly gives no indication that Mr. Villa viewed the video. As in *Lucas* and *Flagg*, we must find second-prong plain error. As we have found the trial evidence sufficient to convict, there are no double-jeopardy implications in remanding this case. See *Flagg*, 2021 IL App (1st) 191692-U, ¶¶ 58-59 (citing *People v. Drake*, 2019 IL 123734, ¶ 20).

¶ 69       Accordingly, the judgment of the circuit court is reversed and this cause is remanded.

¶ 70       Reversed and remanded.